**I.V. SERVICES OF AMERICA, INC., Plaintiff–Appellant,**

v.

**TRUSTEES OF the AMERICAN CONSULTING ENGINEERS COUNCIL INSURANCE TRUST FUND; Felker Benefit Services, a Division of Kirke–Van Orsdel, Inc.; and Metropolitan Life Insurance Co., Defendants–Appellees.**

**Nos. 797, 1430, Dockets 96–9560, 97–7770.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1997.

Decided Jan. 20, 1998.

Francis A. Miniter, Minter & Assocs., Hartford, CT (Daniel S. Fabricant, Joseph D. Uradnik, of counsel), for Plaintiff–Appellant.

Allan M. Marcus, New York City (Thomas F. Maxwell, Jr., Matthew M. Hausman, Marsh, Day & Calhoun, Southport, CT, of counsel), for Defendants–Appellees.

Before FEINBERG, OAKES, and CALABRESI, JJ.

CALABRESI, Circuit Judge:

This case involves the interpretation of a provision of a group health/life insurance plan ("Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Under the Plan, drugs provided for home health care are covered only if they "are approved by the United States Food and Drug Administration for general use in treating the injury or illness for which they are prescribed." The plaintiff-appellant, I.V. Services of America ("I.V. Services"), a home intravenous drug therapy provider, seeks reimbursement from defendants-appellees, the Trustees of the American Consulting Engineers Council Insurance Trust Fund ("ACEC"), Felker Benefit Services, a Division of Kirke–Van Orsdel, Inc. ("KVI"), and Metropolitan Life Insurance Co. ("MetLife"), for medical expenses incurred, allegedly under the Plan. Appellees contend that the terms of the FDA-approval provision clearly and unambiguously deny reimbursement because the appellant's use of the prescribed drugs was not FDA-approved. I.V. Services counters that not only are the "FDA-approval" terms ambiguous, but that past Plan practice actually mandates reimbursement.

I. BACKGROUND

From June 10 to June 17, 1991, Michael Whitehurst, a hemophiliac who contracted AIDS from a blood transfusion, was hospitalized in the Vanderbilt University Medical Center ("Vanderbilt Hospital") for treatment of CMV Retinitis, an AIDS-related infection

that causes blindness. Dr. Mark Pierce, Director of Vanderbilt's Infectious Diseases Out–Patient Services, treated Mr. Whitehurst's condition with Ganciclovir, an FDA-approved drug. No one questions that the cost of the Ganciclovir treatment was covered by the Plan. Ganciclovir, however, causes neutropenia, a decrease in the white blood cell count, which is particularly dangerous to AIDS patients. To counteract the neutropenia, Dr. Pierce prescribed Neupogen, which was administered to Mr. Whitehurst in the hospital. Vanderbilt Hospital was subsequently reimbursed by the Plan for the expenses associated with the Neupogen treatment. Later, when Mr. Whitehurst was about to be discharged, Dr. Pierce prescribed two drugs, Neupogen and Leukine, that Mr. Whitehurst was to be given on a continuing basis after he had left the hospital.

Once home, Mr. Whitehurst contracted with I.V. Services to provide the home drug therapy treatments of Neupogen and Leukine. In exchange, he assigned to I.V. Services his insurance benefits under the Plan.

In due course, I.V. Services submitted a claim for reimbursement under the Plan to KVI, which makes initial claims decisions for the Plan. On January 22, 1992, KVI denied coverage for the drug therapy treatments. It gave two reasons for its actions: the experimental nature of the drugs, and lack of specific FDA-approval for this treatment.[1] After its initial denial, KVI referred the claims to MetLife, which, as claims adminis-

trator, makes all final claims decisions. Following two reviews of the claim denial (which were specifically requested by I.V. Services in April and August of 1993), MetLife formally denied coverage by letter on December 28, 1993. It based its denial on the fact that the drugs Neupogen and Leukine were not specifically approved for the purposes prescribed, as required under the Plan. Notwithstanding further appeals and requests by I.V. Services, MetLife thereafter refused to conduct any additional reviews.

I.V. Services sued, alleging violations of ERISA, 29 U.S.C. §§ 1132, 1133.[2] It claimed (1) that defendants failed to grant a full and fair review of the denied claim; and (2) that because the defendants had, in the past, paid for the use of the drugs, it was arbitrary and imprudent not to reimburse I.V. Services.[3] Both parties moved for summary judgment.

On October 24, 1996, the United States District Court for the District of Connecticut (Gerard L. Goettel, *Judge*) granted summary judgment to the defendants. I.V. Services appealed, but soon after filed a Rule 60(b)(1) motion to reopen the judgment, asserting five factual errors in the district court's opinion. Subsequently, I.V. Services filed a supplementary Rule 60(b)(3) motion, alleging fraud and/or misconduct on the part of the defendants. The parties agreed to a voluntary withdrawal (without prejudice) of the appeal of the summary judgment. As a

---

1. Much confusion exists as to the exact dates of the denial of coverage and whether it was timely. On June 26, 1991, Dr. Pierce wrote a letter to an employee of KVI regarding the medical need for the administration of Neupogen to Mr. Whitehurst. This letter also urged KVI to reconsider its decision not to reimburse such treatment under the Plan. I.V. Services dates the submission of its claim from this letter. It asserts, however, that its knowledge of denial of the claim occurred somewhat later, when it received the first official letter (dated January 22, 1992) of denial of coverage that is in the record. Appellees claim, however, that I.V. Services knew that reimbursement had been denied as early as June 26, 1991, when Dr. Pierce wrote his letter.

These exact dates are not relevant on appeal, however, because the issue of timely denial of coverage was not adequately raised by I.V. Services in its complaint, and thus is not before us.

2. We agree with our sister circuits that, under federal common law, the assignees of beneficiaries to an ERISA-governed insurance plan have standing to sue under ERISA. *See, e.g., Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272, 1277 (6th Cir.1991); *Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir.1991); *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1289 (5th Cir.1988); *Misic v. Building Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1379 (9th Cir.1986).

3. In its complaint, I.V. Services alleges not only the undisputed fact that the Plan paid for Neupogen while Mr. Whitehurst was hospitalized, but also that the Plan paid for "Leukine, Neupogen, and other drugs during the course of [Mr.] Whitehurst's treatment." The record confirms only that the Plan reimbursed Vanderbilt Hospital for the expenses associated with Ganciclovir and Neupogen.

result, jurisdiction was returned to the district court, which denied the Rule 60(b) motions on May 13, 1997. I.V. Services promptly reinstated the original appeal of the grant of summary judgment, and also appealed the denial of its 60(b) motions.

## II. DISCUSSION

■ This appeal hinges on the interpretation of the Plan's provision limiting coverage for medical drugs to those approved by the FDA "for general use in treating the injury or illness for which they are prescribed." [4] The appellees contend that this language clearly and unambiguously restricts coverage to those drugs that are FDA-approved for treatment *of a particular condition caused by a particular illness.* In other words, according to appellees, to be covered, the drugs administered to Mr. Whitehurst

by I.V. Services had to be FDA-approved for treating neutropenia in AIDS patients who had been given Ganciclovir as a treatment for CMV Retinitis. Appellant I.V. Services' position is that the provision should be read more broadly to cover the use of any FDA-approved drug so long as it is employed in treating the same condition (or symptoms) [5] for which the FDA has permitted the drug to be prescribed. Such uses of drugs are termed "off-label" uses. In short, appellant argues that because Neupogen is FDA-approved for treating neutropenia in, for example, certain cancer patients, it is also is covered when used to counter neutropenia regardless of the root cause of the neutropenia in the particular patient. Thus, according to appellant, the fact that Mr. Whitehurst developed neu-

---

**4.** This language is contained in the "Summary Plan Description," which, in the section headed "Comprehensive Medical Expense Benefits" (which includes home health care services), includes under "Limitations":

> (7) expenses incurred for prescription drugs shall be limited to those drugs which can be obtained only by a doctor's prescription and are approved by the United States Food and Drug Administration *for general use in treating the injury or illness for which they are prescribed.*

(emphasis added).

I.V. Services asks us to find that this language of the Summary Plan Description (a thirty-four page booklet) is in conflict with the language of the Plan of Insurance Insert (a seventy-three page document), which should control.

Similar limiting language is found, however, in the Plan of Insurance Insert. Listed under the heading "Major Medical Expense Benefits" (subheading "Medical Services or Supplies Which May Be Covered Medical Expenses") is:

> *Type A Expense*
> *     *     *     *     *     *
> (6) Covered Expenses for Home Health Care
> *     *     *     *     *     *
> (d) medical supplies, drugs and medication ... to the extent such items would have been covered under this Benefit if the Covered Person had been confined in a Hospital.
> *     *     *     *     *     *
> *Type B Expense*
> *     *     *     *     *     *
> (10) Drugs and medicines which:
> *     *     *     *     *     *
> (b) are approved by the [FDA] *for general use in treating the sickness or injury for which they are prescribed;* and

(c) must be administered during a period of Hospital confinement as an inpatient.

(emphasis added).

We read the term for coverage under (6)(d) above—that drugs are covered "to the extent such items would have been covered under this Benefit if the Covered Person had been confined in a Hospital"—to refer to the provision under (10), which sets the coverage for drugs administered during hospital confinement. And this provision includes limiting language, similar to that found in the Summary Plan Description—that the drugs must be FDA-approved "for general use in treating the sickness or injury for which they are prescribed."

We find that it is reasonable to assume that the language under (6)(d), limiting coverage to the extent covered "under this Benefit" for drugs administered during hospital confinement, refers to coverage under "Major Medical Expense Benefits," which includes both the "Type A" and "Type B" expenses. We, therefore, reject I.V. Services' argument that it is incongruous to read a limitation under a "Type B" expense into one under a "Type A" expense. Accordingly, we find that the limiting language included in the Summary Plan Description does not conflict with that contained in the Plan of Insurance Insert.

**5.** While appellant uses the term "sickness" or "illness" (the terms used in the relevant Plan provisions), we will instead use other (neutral) terms, like "condition," "symptoms," and "disease," to avoid seeming to predetermine by our choice of words the question of whether the use in question was covered by the Plan.

tropenia as a result of AIDS-required Ganciclovir treatment, rather than from cancer (or from drugs used to treat cancer), in no way bars coverage. The district court, however, granted summary judgment in favor of appellees, finding the language of the provision clearly supported their narrower interpretation.

We review a grant of summary judgment *de novo*. *See Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir.1996). Summary judgment is not proper unless no genuine issue of material fact exists, and unless the undisputed facts mandate judgment for the movant as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995). When both parties have moved for summary judgment, we consider each motion separately, "resolv[ing] all ambiguities and draw[ing] all inferences [from the record] in favor of the party against whom summary judgment is sought." *LaFond v. General Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir.1995).

### A. Ambiguity in the Plan Language

In support of their position that the Plan language limited reimbursement to the particular treatment regimen for the specific patient population cited by the FDA in approving the drug, appellees submitted a letter from their in-house medical expert that listed the following FDA-approved uses of the drugs at issue:

1) Leukine—for "acceleration of myeloid recovery in patients with non-Hodgkin's lymphoma, acute lymphoblastic leukemia, and Hodgkin's disease undergoing autologous bone marrow transplantation."

2) Neupogen—"to manage neutropenia in non-myeloid malignancies receiving myelo suppressive anticancer drugs associated with a significant incidence of neutropenia with fever."

They did not offer into the record any definitive statement by the FDA concerning the FDA-approved indications for the two drugs. Instead, they rely upon the aforementioned letter of their in-house medical expert, and the fact that Dr. Pierce, in his letter urging coverage for Neupogen, stated that the drug was not FDA-approved for treating low white blood cell counts in AIDS patients.

But the Plan language does not on its face limit coverage to specific "FDA-approved indications" or even "FDA-approved uses" of medical drugs. And appellees' submissions do not lead to an inevitable conclusion that FDA approval "for general use in treating the injury or illness for which [the drugs] are prescribed" must be read in such a narrow fashion. Indeed, appellant offers a statement from the *FDA Drug Bulletin* (April 1982) entitled "Use of Approved Drugs for Unlabeled Indications" that acknowledges:

Once a product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling.

The same bulletin further concludes that "[t]he term "unapproved uses" is, to some extent, misleading."

Thus, the FDA statement provides support for I.V. Services' position that Dr. Pierce's prescription of Neupogen to treat neutropenia in Mr. Whitehurst falls within the ambit of Plan coverage "for general use in treating the ... illness for which [the drugs] are prescribed." Neupogen, I.V. Services argues, has been approved by the FDA to treat neutropenia—albeit in cancer patients—hence its use in counteracting neutropenia resulting from the effects of Ganciclovir in an AIDS patient is covered, even though that specific use is not included in FDA-approved *labeling*.

We examine *de novo* the issue of ambiguity in the terms of the Plan. *See O'Neil v. Retirement Plan*, 37 F.3d 55, 58–59 (2d Cir.1994). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* at 59 (internal quotation marks and citation omitted). And contrary to the district court's finding, we hold that the terms of the Plan did not clearly and unambiguously preclude coverage for I.V. Services' administra-

tion of Neupogen to Mr. Whitehurst. The grant of summary judgment to appellees was, therefore, improper.

It is less clear from the record before us whether Leukine was also prescribed for the treatment of neutropenia, or, more precisely, whether it is FDA-approved "for treating the . . . illness for which [it] was prescribed." As a result, while on the record before us we are able to determine that the Plan language is ambiguous with respect to coverage for the administration of Neupogen to Mr. Whitehurst, we cannot be equally sure with respect to coverage for Leukine.[6]

It follows that, on remand, the appellees should be required to provide the court with an official statement of the FDA-approved indications for both Neupogen and Leukine and the appellant should be asked to submit a statement from Dr. Pierce that indicates the condition(s)/illness(es) for which the drugs were prescribed.

B.  *Interpretation of the Plan: i) the Plan's reimbursement to Vanderbilt Hospital for the administration of Neupogen to Mr. Whitehurst; ii) the rule of contra proferentem*

■ Given that the Plan language is not, by itself, clear and unambiguous as to its coverage of FDA-approved drugs for prescribed "off-label" uses, matters outside of the contract terms themselves become relevant. Of particular significance are: (1) evidence of how the Plan language has been interpreted by the Plan administrators in the past; and (2) who drafted the contract terms.

It is undisputed that, while Mr. Whitehurst was hospitalized at Vanderbilt Hospital, Dr. Pierce prescribed Neupogen to treat the neutropenia that resulted from the administration of Ganciclovir to Mr. Whitehurst (to treat his AIDS-induced blindness). It is also uncontroverted that the Plan reimbursed

Vanderbilt Hospital for the expenses associated with this Neupogen treatment.

The parties, however, draw conflicting conclusions from this evidence. I.V. Services moved for summary judgment, relying on the fact that, under the terms of the Plan, home health care drugs are covered "to the extent such items would have been covered under this Benefit if the Covered Person had been confined in a Hospital." Since the Plan had paid Vanderbilt for the use of Neupogen while Mr. Whitehurst was hospitalized, I.V. Services argued, it should likewise have reimbursed I.V. Services for its home health care administration of the drug.

The appellees, in opposing I.V. Services' motion for summary judgment, rejected the contention that the Plan's reimbursement to Vanderbilt Hospital demonstrated that the use of Neupogen fell within the ambit of its coverage provisions:

> Although such payments [to Vanderbilt] may have been made, there is not even a scintilla of evidence showing that the Defendants made such payments out of a belief that Neupogen was approved by the FDA for in-hospital use or had ever made such a finding.

And in support this position, appellees submitted a supplemental affidavit by Penny Traughber, a claims consultant for KVI. The affidavit stated: "The payments . . . were not made based on a determination that Neupogen was approved by the FDA for the use prescribed, but rather were the result of a claim processing oversight."

■ Relying on this affidavit, appellees emphasized that "[t]he mere occurrence of a few payments does not rule out other reasons for such payment, such as a claims processing oversight," and asserted that "the Plaintiff has failed to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[7] We agree

---

**6.** A letter from Dr. Pierce to KVI states that Mr. Whitehurst needed Leukine "to increase his white blood cell (WBC) count" and that "Neupogen . . . and Leukine . . . are quite similar in nature and action." And we note that, according to appellees, Leukine is FDA-approved "for acceleration of myeloid recovery" in certain types of patients. But, without more precise information relating to Dr. Pierce's prescribed use and

the FDA-approved indications for Leukine, we are unable to determine Leukine's status under the Plan. All we can say at this time is that it may, or may not, be covered.

**7.** Appellees reiterated this position in their Rule 9(c) Statement of Controverted Facts, claiming, "Although payments were made for Neupogen in

that the affidavit undoubtedly sufficed to raise an issue of fact as to whether appellees had earlier interpreted the Plan to provide coverage for off-label uses of FDA-approved drugs, or had simply made a processing error. It was enough, therefore, to preclude a grant of summary judgment to I.V. Services.

Appellees, however, also claimed that this same Traughber affidavit was sufficient to require that their *own* motion for summary judgment be granted. They argued that "[t]he Plaintiff has failed to rebut the fact that the payments for Neupogen made to Vanderbilt Hospital in June 1991 were the result of a claims processing oversight." Absent such a rebuttal, they contended, summary judgment in their favor was appropriate.

The district court agreed, stating that "[d]efendants assert, and plaintiff[ ] offers no reason to doubt, that Vanderbilt was provided coverage for Neupogen only because of an administrative error—a claim processing oversight," and granted summary judgment. But this was plainly erroneous.

First, a finder of fact need not have believed Traughber's self-serving affidavit. It is as plausible, *given the ambiguity in the Plan language*, that appellees originally read the coverage as appellants now do, and that the affidavit was, to put it politely, an afterthought. Second, even if the payment to Vanderbilt Hospital were to be found by a finder of facts to have been due to a processing error, as the affidavit says, the same factfinder could, nonetheless, still read the ambiguous Plan language to grant coverage for off-label uses. In other words, while past inconsistent readings of the Plan language by the appellees would certainly count against

the appellees' current interpretation of that language, *consistent* readings of the Plan by appellees in no way mean that a factfinder must resolve the Plan's ambiguities in appellees' favor.

■■■■■ In this respect, the finder of fact, in interpreting the Plan's ambiguous language, may also take into account that the Plan terms were written by appellees.[8] In addition to their assertion that the Plan language is clear and unambiguous, the appellees argue that the rule of contra proferentem should not apply because the contract of insurance was between an insurance company (MetLife) and a large group policyholder (Trustees of ACEC)—sophisticated entities of equal bargaining power. But appellees' argument, if accepted, would virtually eliminate the relevance of contra proferentem in any ERISA-governed group health/life insurance Plan that is itself insured. It is true that "[s]ince this is an ERISA case, we are not necessarily bound by the hornbook rule of contract interpretation that ambiguities in an insurance policy are to be construed against the insurer...." *Masella v. Blue Cross & Blue Shield*, 936 F.2d 98, 107 (2d Cir.1991) (internal quotation marks and citations omitted). But, as our court has also held, "We believe that application of [the contra proferentem] rule of interpretation to de novo review of ERISA insurance plans is an appropriate implementation of the congressional expectation that the courts will develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989)).[9] Thus, Mr.

June 1991, said payments were made as the result of a claims processing oversight."

8. Under our cases, "such rules of construction are principles of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless." *O'Neil*, 37 F.3d at 61 (internal quotations and citations omitted). We think, nevertheless, that in this case, where the Plan terms are ambiguous and there is some extrinsic evidence suggesting an interpretation contrary to that of the drafter, such rules of construction may play a role.

9. In *Firestone*, the Supreme Court held that "a denial of benefits challenged under [ERISA] is to

be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" in which case determination is reviewed under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). And, as appellees assert, our cases make clear that the rule of contra proferentem applies to interpretation of Plan terms only under *de novo* review. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443 (2d Cir.1995). In this case, the district court declined to determine whether the Plan gave its administrator the type of discretion-

Whitehurst (or I.V. Services standing in his shoes) should be able to claim that any contract ambiguities are to be interpreted against appellees who wrote the contract. To hold otherwise would be to afford a lesser degree of protection to employees of insured ERISA-governed group health plans, "a result that would be at odds with the congressional purposes of promoting the interests of employees and beneficiaries and protecting contractually defined benefits." *Id.*

### III. CONCLUSION

We hold that the ambiguous language of the Plan itself suffices to raise issues of material fact and precludes a grant of summary judgment in appellees' favor. The evidence that the Plan reimbursed Vanderbilt Hospital for the same off-label use of Neupogen for which appellees now seek to deny coverage, together with the fact that appellees wrote the Plan terms, might, in the absence of an explanation for that payment, have sufficed to warrant summary judgment

for appellant. Given the Traughber affidavit, however, that is no longer the case. Thus, while the district court properly denied summary judgment in favor of I.V. Services, the court erred in granting summary judgment to appellees.

The judgment of the district court granting summary judgment in favor of appellees is, therefore, reversed.[10] The case is remanded to the district court for further proceedings, including additional development of the record with respect to (1) the use for which Leukine was prescribed by Dr. Pierce;[11] and (2) the explanation for the Plan's coverage of expenses associated with the in-hospital administration of Neupogen to Mr. Whitehurst.[12]

---

ary authority described in *Firestone* (in which case the proper standard of review would be the arbitrary and capricious standard), because it found that "defendants are entitled to judgment even under a *de novo* review."

Without explicitly ruling on this issue, we observe that the Plan provisions relied upon by appellees "bear little resemblance to the typical plan provisions cited in recent post-*Firestone* appellate decisions as the basis for a more deferential review." *Masella*, 936 F.2d at 103 (citations omitted). The Plan provides that "[MetLife] will make the decision as to whether ... [s]uch [surgical, medical, or dental] service or confinement is qualified for benefits under This Plan," and that it "makes determination on appeal of claim denials." This grant of authority does not approach the "typical plan provisions" on the basis of which appellate courts have exercised review under the more deferential arbitrary and capricious standard. *See Masella*, 936 F.2d at 103 (citing, *inter alia, Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990) (trustees of the plan were given power "to construe the provisions of ... the Plan"); *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 443 (5th Cir.1989) (trustees of the plan were given "full power to construe the provisions of this Agreement" and authority to "interpret the Plan")); *see also Moriarity v. United Techs. Corp. Represented Employees Retirement Plan*, 947 F.Supp. 43, 50 (D.Conn.1996) (the plan provided that a committee had the power "[t]o interpret the Plan and to decide any and all matters arising hereunder, including the right to remedy

possible ambiguities, inconsistencies or omissions").

10. In addition to challenging the district court's grant of summary judgment to appellees, I.V. Services appeals the court's refusal to grant I.V. Services' Rule 60(b) motions to reopen judgment and vacate its earlier decision granting summary judgment.

We need not review the district court's denial of the 60(b) motions given that we reverse the court's grant of summary judgment.

11. In this respect, we note that if Leukine was—like Neupogen—approved by the FDA for treating the condition suffered by Mr. Whitehurst, albeit arising from other root causes, the fact that there was no hospital administration of Leukine and hence no reimbursement for it, need not foreclose appellant's claims with respect to coverage for Leukine. A finder of fact that determined (perhaps in part in view of the reimbursement for the in-hospital prescribed Neupogen) that the Plan *did* afford coverage for off-label uses, could on that basis find that Leukine was also covered if its prescription was for a similar use.

12. We note further that the evidence that I.V. Services attempted to bring to the court's attention in its Rule 60(b)(3) motion, namely some documents demonstrating that appellees had reimbursed Vanderbilt following an audit of the charges—which were properly excluded by the

district court at that stage—can be brought before the district court on remand.