William ARAMONY, Plaintiff,

v.

UNITED WAY OF AMERICA, individually and as administrator and named fiduciary under The United Way of America Replacement Benefit Plan, and as administrator of the United Way Supplemental Benefits Agreement, United Way Replacement Benefit Plan and United Way of America Supplemental Benefits Agreement, Defendants.

No. 96 CIV 3962(SAS).

United States District Court, S.D. New York.

Jan. 4, 2000.

Michael Bailey, Dennis Houdek, Falcone, Houdek, Bailey & Curd, LLP, New York, NY, for William Aramony.

Elise M. Bloom, Jackson, Lewis, Schnitzler & Krupman, New York, NY, Paul J. Ondrasik, Jr., Sara E. Hauptfuehrer, Steptoe & Johnson LLP, Washington, DC, for United Way of America.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

In 1992, United Way of America ("UWA") terminated William Aramony, its President and Chief Executive Officer of twenty-two years. Following his termi-

nation, Aramony sued UWA for unpaid pension benefits and salary, as well as legal expenses; UWA asserted a number of counterclaims, including breach of fiduciary duty and breach of employment agreement. Following a five-day bench trial, this Court concluded "that UWA owes Aramony certain monies, and that Aramony owes certain monies to UWA." *Aramony v. United Way of America*, 28 F.Supp.2d 147, 153 (S.D.N.Y.1998) ("*Aramony I*"). On appeal, the Second Circuit affirmed this Court's decision in all but one respect and remanded the case for reconsideration of that single issue. *See Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140 (2d Cir.1999) ("*Aramony II*").

The issue on remand is relatively narrow. In 1984, UWA created a non-qualified pension plan ("Replacement Benefit Plan" or "RBP"), which was intended to replace benefits that could not be paid under UWA's qualified defined benefit pension plan as a result of limitations imposed by the Internal Revenue Code ("I.R.C."); Aramony was one of the executives eligible for the RBP. *See Aramony I*, 28 F.Supp.2d at 153. After trial, I concluded that UWA was estopped from arguing that Aramony was not entitled under the RBP to benefits offsetting the impact of 26 U.S.C. § 401(a)(17), because UWA had represented to Aramony that he would receive those benefits. *See id.* at 169–71. The Second Circuit disagreed, ruling that Aramony had not satisfied the requirement in ERISA cases that a party asserting promissory estoppel demonstrate "extraordinary circumstances." *Aramony II*, 191 F.3d at 150–53 (citing *Bonovich v. Knights of Columbus*, 146 F.3d 57, 63 (2d Cir.1998)). The Second Circuit then stated:

> We therefore reverse the determination of the district court that United Way is estopped from denying that the RBP provides a benefit offsetting the effect of § 401(a)(17). As part of its estoppel analysis, the district court decided, how-

ever, that the RBP was ambiguous on this point. We remand, therefore, so that the district court may consider whether United Way is contractually bound by the RBP itself to provide the benefit to Aramony.

*Id.* at 153. The parties have briefed the remand issue and have agreed to rely exclusively on the evidence already in the record.

## I. BACKGROUND

Because the background of this case has already been described in detail, *see Aramony I*, 28 F.Supp.2d at 153–66, I will summarize here only the facts relevant to the remand issue.

UWA is a non-profit corporation organized under the laws of New York and having its principal place of business in Alexandria, Virginia. *Id.* at 153. UWA is governed by a volunteer Board of Governors and a full-time President and Chief Executive Officer ("CEO"). *Id.* The Executive Committee of UWA's Board of Governors ("Executive Committee") is a subcommittee of the Board of Governors that is authorized to adopt pension plans and executive compensation arrangements on behalf of UWA. *Id.* Aramony served as UWA's President and CEO from 1979 until March 16, 1992. *Id.*

The general practice at UWA was for the Executive Committee to adopt the concept of a pension plan, but not to decide the details of the plan. *Id.* at 153–54. Those details were worked out by Stephen Paulachak, a Senior Vice President of UWA and the person principally responsible for handling UWA's pension plans and executive compensation arrangements, and Mutual of America Life Insurance Co. ("Mutual"), with whom UWA had signed a group annuity contract. *Id.*

On February 27, 1984, the Executive Committee followed this procedure when it adopted the RBP. *Id.* at 154. At that meeting, Paulachak distributed an agenda setting forth the basic principles of the RBP, as well as the general features of

other pension-related plans which were approved at the same meeting. *Id.* In his agenda, Paulachak explained the purposes of the RBP: (1) to restore the pension benefit lost due to the restrictions imposed by I.R.C. § 415, which imposes dollar limitations on the amount of benefits that can be paid out under a qualified pension plan; and (2) to restore the pension benefit lost as a result of Rev. Rul. 80–359, which excluded deferred compensation from the definition of compensation under UWA's qualified benefit plan. *Id.* at 154 & n. 1. The minutes of the meeting show that the Executive Committee followed Paulachak's recommendation and authorized UWA to establish an RBP. *Id.* at 154.

Consistent with its usual practice, the Committee expected that Paulachak would work out the specific terms of the plan with Mutual. *Id.* Paulachak informed Mutual that the Board had approved an RBP and requested that Mutual create a final plan document. *Id.* For reasons that are not entirely clear, Mutual did not provide Paulachak with a final plan document until May 1985. *Id.* On May 16, 1985, Paulachak signed Mutual's plan document on UWA's behalf. *Id.* UWA's highly paid executives, including Aramony, whose qualified pension benefits were likely to be affected by the I.R.C. restrictions, were eligible for the RBP. *Id.* at 153.

In 1986, Congress passed 26 U.S.C. § 401(a)(17), entitled "Compensation limit," which states:

(A) In general.—A trust shall not constitute a qualified trust under this section unless, under the plan of which such trust is a part, the annual compensation of each employee taken into account under the plan for any year does not exceed $150,000.

(B) Cost-of-living adjustment.—The Secretary shall adjust annually the $150,000 amount in subparagraph (A) for increases in the cost-of-living at the same time and in the same manner as adjustments under section 415(d); except that the base period shall be the

calendar quarter beginning October 1, 1993, and any increase which is not a multiple of $10,000 shall be rounded to the next lowest multiple of $10,000.

26 U.S.C. § 401(a)(17). Benefits are calculated under UWA's qualified defined benefit plan by multiplying a fixed ratio by salary (a five-year average) and multiplying the result by years of service. *See Aramony I,* 28 F.Supp.2d at 169 n. 21. Effective after January 1, 1988, § 401(a)(17) caps the amount of salary that may be used in this formula to calculate qualified benefits. *Id.*

On September 12, 1990, UWA's Executive Committee met to discuss a number of topics. *See* Pl.Ex. 30. At that meeting, the Executive Committee amended the RBP to add a component which would replace benefits lost under UWA's qualified benefit plan as a result of a change in the benefit formula mandated by the Tax Reform Act of 1986 (the "1990 Amendment"). *See Aramony I,* 28 F.Supp.2d at 155; Pl.Ex. 30, at 2–3. No plan document incorporating the 1990 Amendment was ever generated. *See Aramony I,* 28 F.Supp.2d at 155. At that same meeting, UWA's Executive Committee increased Aramony's 1991 salary to $365,000 (from $345,000). *See* Pl.Ex. 30, at 2. The minutes of this meeting indicate that Paulachak told the Executive Committee that the salary increase "was desirable to maintain growth in the President's pension base." *Id.*

In October 1988 and January 1989, Mutual sent Aramony estimates of his pension benefits. *See Aramony I,* 28 F.Supp.2d at 169. The figures contained in these estimates "reveals Mutual's belief that Aramony's RBP benefits would make up for the effect of § 401(a)(17) on Aramony's defined benefit plan." *Id.* In addition, "[t]he Annual Valuation Reports that Mutual prepared for UWA between 1988 and 1991 explicitly stated that Mutual had taken into consideration the effect of § 401(a)(17) on the RBP. The reports also contained benefit figures that were consistent with a

§ 401(a)(17) make-up benefit." *Id.* at 170 n. 23.

## II. DISCUSSION

The Second Circuit remanded so that this Court could determine whether UWA was "contractually bound by the RBP itself to provide" Aramony with a benefit offsetting the impact of § 401(a)(17). *See Aramony II*, 191 F.3d at 153. If UWA must offset the impact of § 401(a)(17), then Aramony will receive $3,221,057 in pension benefits under the RBP; if not, then Aramony will receive $1,872,143. *See Aramony I* at 169–70 & n. 22.[1]

Two provisions of the RBP are relevant to this issue. Article I, entitled "Purpose of the Plan," states:

This Plan is an arrangement for a select group of management and highly compensated personnel, and all rights hereunder shall be governed by and construed in accordance with the laws of the State of Virginia.

This Plan is being installed to provide a mechanism for securing the pension benefit promises made to its management and highly compensated key employees who may receive relatively smaller retirement benefits under the existing pension arrangement than rank and file employees will receive as a result of limitations imposed by the Internal Revenue Code and rulings thereunder on the amount of pensions payable to the highly compensated. This Plan is in addition to current compensation and other employee benefits.

Pl.Ex. 1, at 1. Article V, entitled "Contributions and Benefits," states, in relevant part:

*Section 5.01* The Committee, pursuant to Section 3.02 shall specify which of the formulae set forth in Sections 5.02, 5.03, 5.04 or 5.05 shall be applicable to each eligible group of Participants.

*Section 5.02* (Excess over Section 415 Limit). The contribution to be made to this Plan, in each Plan Year, on behalf of each eligible Participant, shall be equal to the difference between:

(a) the contribution that would have been made on behalf of such Participant under the Pension Plan sponsored by the Employer without the limitation on the annual addition imposed by Section 415 of the Internal Revenue Code, and

(b) the amount that has actually been contributed on such Participant's behalf and allocated to his individual account under that Plan.

*Section 5.05* (Additional benefits or contributions). The benefit to be provided under this Plan on behalf of each eligible Participant shall be the sum of (a) plus (b) below:

(a) the yearly contributions required pursuant to Section 5.02, 5.03, or 5.04, whichever is applicable, and

(b) any additional contributions or benefit amount that the Employer has agreed to pay to the Participant pursuant to either a contractual commitment or a resolution of the Board of Trustees of the Employer.

Pl.Ex. 1, at 3–5. The RBP indicates that the parties selected § 5.02 as the applicable provision. *See* Pl.Ex. 1, at 3.

In *Aramony I*, this Court concluded that the RBP was ambiguous as to whether it was intended to compensate for the impact of § 401(a)(17) on Aramony's pension benefits:

---

1. Although this Court's original opinion and order calculated the lower number at $1,497,-267, not $1,872,143, that calculation did not include the undisputed offset for the Tax Reform Act, the subject of the 1990 Amendment, which totals $374,876. *See* Memorandum of Law of Defendant United Way of America in Support of its Position on the Issue Remand-

ed from the U.S. Court of Appeals for the Second Circuit ("UWA Mem.") at 2 n. 3; Reply Memorandum of William Aramony on Remand from the Second Circuit Court of Appeals in Support of Order Making Further Findings of Fact ("Aramony Reply Mem.") at 3 n. 1.

What renders the plan document ambiguous on this issue is the plan's expressly stated purpose.... [T]he effect of § 401(a)(17), which became effective in 1988, was to reduce the § 415 make-up benefits of highly-compensated RBP participants. This result—an unanticipated windfall for UWA and an unexpected loss of pension benefits for RBP participants—directly contravenes the plan's stated purpose of securing the pension benefits promised by UWA to its key employees. This conflict between the plan's stated purpose and the effect of § 401(a)(17) renders the [RBP] ambiguous on the question of whether it provides for § 401(a)(17) make-up benefits.

*Aramony I,* 28 F.Supp.2d at 170. In its decision to remand, the Second Circuit noted this finding of ambiguity. *See Aramony II,* 191 F.3d at 153. In their briefs on the remand issue, neither party challenges that finding. *See* Memorandum of William Aramony on Remand from the Second Circuit Court of Appeals in Support of Order Making Further Findings of Fact ("Aramony Mem.") at 6; UWA Mem. at 1–2.

 "The primary objective in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language they chose to use." *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (citation omitted). When the language chosen by the parties is ambiguous as to their intent, "then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." *Id.* at 1095. Citing principles of contract construction, UWA offers three ways to resolve the ambiguity in the RBP without considering extrinsic evidence. None of UWA's suggested methods, however, sufficiently resolve the ambiguity to prevent consideration of extrinsic evidence.

First, UWA contends that Article I is a general statement of the RBP's purpose and Article V is the specific implementation of that purpose, with the applicable provisions covered by the RBP therefore limited to those stated in Article V. The essence of this argument is that, because § 401(a)(17) had not been enacted when the RBP was created, the parties could not have intended the RBP to include § 401(a)(17). *See* UWA Mem. at 5 ("A reasonable interpretation of these provisions, read together, is that the RBP's purpose is to replace benefits lost by reason of the tax law limitations expressly identified elsewhere in the more specific provisions.").

In *Aramony I,* however, this Court stated that "[t]he absence of any mention of § 401(a)(17) from the [RBP] is not, of course, determinative of the RBP's scope. That plan was signed in 1985, one year before Congress enacted § 401(a)(17)." *Aramony I,* 28 F.Supp.2d at 170 n. 24. The RBP states that its purpose is "to provide a mechanism for securing the pension benefit promises made to [UWA's] management and highly compensated key employees who may receive relatively smaller retirement benefits ... as a result of limitations imposed by the Internal Revenue Code and rulings thereunder on the amount of pensions payable to the highly compensated." Pl.Ex. 1, at 1. Section 401(a)(17) is a limitation imposed by the I.R.C. on the amount of pensions payable to the highly compensated. Moreover, § 401(a)(17) deprives Aramony of the pension benefit promises made by UWA. *See Aramony I,* 28 F.Supp.2d at 169 n. 21 ("If ... the RBP were interpreted as offsetting the effect of § 401(a)(17), then plan participants would be entitled to the amount of benefits that UWA's Executive Committee anticipated paying out, and UWA's employees anticipated receiving, when the RBP was enacted in 1985."). Thus, the stated purpose of the RBP appears to include § 401(a)(17) within its scope.

Second, UWA argues that the RBP does not include an offset for § 401(a)(17) be-

cause the language of § 5.02 of the RBP, the provision applicable in this case, only mentions § 415. But the fact that § 5.02 only mentions § 415 does not resolve the ambiguity, which comes from the interplay of Article V, of which § 5.02 is a part, and Article I, the general statement of purpose. As explained above, it is not clear from the language of the RBP that the general statement of purpose in Article I does not include the limitation on pension benefits contained in § 401(a)(17). Indeed, the ambiguity is reinforced by the fact that § 401(a)(17) takes away some of the § 415 make-up benefit explicitly mentioned in § 5.02. *See Aramony I,* 28 F.Supp.2d at 170 ("[T]he effect of § 401(a)(17), which became effective in 1988, was to reduce the § 415 make-up benefits of highly-compensated RBP participants.").

Third, UWA argues that the purpose of the RBP was to eliminate some, but not all, limitations on Aramony's pension benefits. To support this argument, UWA looks to the structure of Article V, which allows for a choice of limitations to be offset, and the fact that the parties chose only to offset the limitation in § 415. There are several problems with this argument. First, the fact that the parties chose the provision that only limited § 415 is of little consequence because UWA admits that "the surrounding circumstances demonstrate that the original RBP was intended to cover both" the § 415 limitation and the deferred compensation limitation. *See UWA Mem. at 6 n. 6.* Second, § 401(a)(17), if not offset, reduces the § 415 make-up benefit. *See Aramony I,* 28 F.Supp.2d at 170 ("[T]he effect of § 401(a)(17) ... was to reduce the § 415 make-up benefits of highly-compensated RBP participants."). Thus, even if the purpose of the RBP was simply to provide a full make-up benefit for § 415, the failure to offset the limitation contained in § 401(a)(17) would frustrate this purpose. Finally, in order to find that the RBP encompasses an offset for the limitation contained in § 401(a)(17), it is not necessary to find that the purpose of the RBP was to compensate Aramony for all tax limitations. Rather, as discussed below, there is sufficient extrinsic evidence to conclude that UWA specifically intended the RBP to provide an offset for § 401(a)(17).

■ Because the principles of contract construction and a more detailed examination of the RBP's language fail to resolve the ambiguity, it is necessary to consider extrinsic evidence of the parties' intent. *See I.V. Services of America, Inc. v. Trustees of the American Consulting Engineers Council Insurance Trust Fund,* 136 F.3d 114, 120 (2d Cir.1998) ("Given that the Plan language is not, by itself, clear and unambiguous ..., matters outside of the contract terms themselves become relevant."). Both parties urge the Court to consider UWA's conduct while the RBP was in effect. "It is hornbook law that where there is ambiguity in a contract the intent of the parties may be ascertained by reference to their subsequent course of conduct." *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 281–82 (S.D.N.Y.1977); *see also I.V. Services,* 136 F.3d at 120 (noting that "evidence of how the Plan language has been interpreted by the Plan administrators in the past" was "[o]f particular significance").

■ Arguing that the RBP is not self-amending, UWA points to the fact that it passed the 1990 Amendment, which accounted for a change mandated by the Tax Reform Act of 1986, but passed no similar amendment to account for § 401(a)(17).[2] UWA contends that, because it did not amend the RBP to account for the passage of § 401(a)(17), it did not intend to include § 401(a)(17) within the scope of the RBP. The problem with UWA's argument is

---

**2.** This Court noted the 1990 Amendment in its original opinion and order. *See Aramony I,* 28 F.Supp.2d at 155.

that, if the parties thought that the RBP already included an offset of § 401(a)(17), the lack of an amendment detailing that fact would not be evidence of their lack of intent.

Consideration of the extrinsic evidence compels the conclusion that UWA thought that the RBP included an offset of § 401(a)(17). In the same document memorializing the 1990 Amendment, UWA's Executive Committee increased Aramony's salary to $365,000 in order "to maintain growth in [his] pension base." Pl.Ex. 30, at 2. If the RBP did not contain an offset of § 401(a)(17), the increase in Aramony's salary would do nothing to increase his pension base because § 401(a)(17) capped his pension base at a level lower than his previous salary.[3] The fact that UWA increased Aramony's salary in order to increase his pension benefits provides strong evidence that UWA did not think that § 401(a)(17) limited those benefits.

The trial testimony of Stephen Paulachak, who served as UWA's benefit plan administrator from 1979 to 1989, corroborates this conclusion:

Q: Mr. Paulachak, do you recall in 1991 that there was a board meeting in which Mr. Aramony's compensation was increased for purposes of maintaining growth in the president's pension base?

A: In '91?

Q: Yes.

A: Yes.

Q: Mr. Paulachak, if Mr. Aramony's pension benefits were capped by 415, would increasing his compensation result in an increase in his pension benefits?

A: No.

Q: Was it your understanding that the logic behind maintaining or behind increasing his compensation for purposes of increasing his pension benefits was to increase the benefit under 401(a)(17)?

A: No.

Q: Would you explain your answer?

A: The consideration was simply the total benefit Mr. Aramony would retire under and not necessarily the vehicle which could be funded and so the purpose of the salary increase, compensation increase, was to raise the overall benefit to Mr. Aramony. It happened that it would be funded out of a make-up or replacement plan.

Q: But if Mr. Aramony's benefits were limited by 415 that wouldn't happen, is that correct?

A: That is correct.

Q: So there had to be another benefit that would be increased by increasing his salary?

A: Correct.

Q: And that benefit was 401(a)(17)?

A: That is correct.

Testimony of Stephen Paulachak ("Paulachak Tr.") at 440–41.

UWA argues that Paulachak could not make binding decisions regarding Aramony's pension and that Paulachak's 1998 testimony about this 1991 meeting is unreliable, both because of the passage of time and because Paulachak had moved to another position by 1991. But Paulachak's testimony is important not for his belief as to whether the RBP includes an offset for § 401(a)(17); what matters is Paulachak's explanation that UWA's decision to increase Aramony's compensation for the purpose of increasing his pension benefits makes no sense unless the RBP includes an offset for § 401(a)(17).

Other extrinsic evidence supports the conclusion that UWA thought that the RBP provided an offset for § 401(a)(17). In *Aramony I*, this Court found that "UWA was plainly aware that Mutual had interpreted the RBP as compensating for the effect of § 401(a)(17)." *Aramony I,* 28

---

**3.** Aramony's salary for 1990 was $345,000, well above the ceiling set by § 401(a)(17).

*See Aramony I,* 28 F.Supp.2d at 156.

F.Supp.2d at 170 n. 23. The evidence supporting this finding was summarized as follows:

> The Annual Valuation Reports [ (the "AVRs") ] that Mutual prepared for UWA between 1988 and 1991 explicitly stated that Mutual had taken into consideration the effect of § 401(a)(17) on the RBP. *See* Pl.'s Exs. 7–11. The reports also contained benefit figures that were consistent with a § 401(a)(17) make-up benefit. *See id.;* Testimony of Robert Sadler ("Sadler Tr.") at 324–25. Finally, Robert Sadler, the former head of Mutual's branch office that handled the UWA account, testified that at an April 28, 1992 meeting, he informed UWA personnel of Mutual's understanding that the RBP compensated for qualified benefits that were lost as a result of § 415, Rev. Rul. 80–359, *and* § 401(a)(17). *See* Sadler Tr. at 335–37.

*Aramony I*, 28 F.Supp.2d at 170 n. 23. In addition, the October 1988 and January 1989 benefit estimates, which "were prepared on UWA's behalf by Mutual," included an offset for § 401(a)(17). *See Aramony I*, 28 F.Supp.2d at 169. As with Paulachak's testimony, the importance of this evidence is not whether Mutual believed that the RBP provided an offset for § 401(a)(17); what matters is that UWA knew about Mutual's belief and did not correct it. *See* E. Allan Farnsworth, *Contracts* § 7.13, at 489 (3rd ed. 1999) ("Sometimes the conduct of the parties after the contract is made indicates the meaning that they attach to the contract language subsequently in dispute. Such 'practical construction' is given great weight by the courts.").

UWA argues that the Court should not rely on the benefit estimates because that is merely the same evidence that formed the basis of Aramony's estoppel argument. But some of the evidence that supported the finding of promissory estoppel necessarily provides the basis for understanding the parties' course of performance. *See* Farnsworth, *Contracts* § 7.13, at 490 ("It is sometimes difficult to draw the line between conduct that is the basis for a course of performance, on the one hand, and conduct that is the basis for a waiver or modification, on the other.").

In addition, UWA urges this Court to reconsider its finding that the AVRs "assumed that the RBP provided § 401(a)(17) make-up benefits." *Aramony I*, 28 F.Supp.2d at 171 n. 25. The AVRs, which state only that § 401(a)(17) was "taken into consideration in the calculations," are unclear as to whether their benefits calculations included an offset for § 401(a)(17). *See* Pl.Ex. 7–10. Nevertheless, it is important to note that UWA does not ask this Court to reconsider its more fundamental finding that "UWA was plainly aware that Mutual had interpreted the RBP as compensating for the effect of § 401(a)(17)." *Aramony I*, 28 F.Supp.2d at 170 n. 23. Whether the AVRs assumed that the RBP provided an offset for § 401(a)(17) is not relevant to the remand issue. The relevant fact—and the one not challenged by UWA—is that UWA knew that Mutual thought the RBP included an offset for § 401(a)(17) and did not inform Mutual that its understanding was incorrect. That supports the conclusion that UWA thought the RBP included an offset for § 401(a)(17).

To summarize, the RBP is ambiguous as to whether it includes an offset of the limitation on pension benefits contained in § 401(a)(17). The extrinsic evidence conclusively demonstrates that UWA thought that the RBP did provide an offset of § 401(a)(17). Accordingly, UWA "is contractually bound by the RBP itself to provide the benefit to Aramony." *Aramony II*, 191 F.3d at 153.

## III. CONCLUSION

For the foregoing reasons, UWA is required to pay Aramony RBP benefits totaling $3,221,057. All other awards contained in *Aramony I* were affirmed by the Second Circuit and remain in effect. In addition, UWA is required to pay post-

judgment interest on the amount of the total award to Aramony, at the rate provided for in 28 U.S.C. § 1961, from November 20, 1998. The parties are directed to prepare a Final Judgment and the Clerk is directed to close the case.

SO ORDERED: