254 F.3d 403 (2nd Cir. 2001)
 WILLIAM ARAMONY, Plaintiff-Appellee,
v.
UNITED WAY OF AMERICA, Individually and as administrator and named fiduciary under the United Way of America Replacement Benefit Plan, and as administrator of the United Way Supplemental Benefits Agreement, UNITED WAY REPLACEMENT BENEFIT PLAN and UNITED WAY SUPPLEMENTAL BENEFITS AGREEMENT, Defendants-Appellants.
 Docket No. 00-7146
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 26, 2000
Decided: June 20, 2001
 
 Former chief executive officer sought to recover pension benefits from former employer. On remand to reconsider CEO's right to certain disputed benefits under the employer's replacement benefit plan, United States District Court for the Southern District of New York, Scheindlin, Judge, held that the replacement benefits contract was ambiguous and that extrinsic evidence demonstrated that the contract provided the disputed replacement benefits. Former employer appealed. The Court of Appeals, Leval, Circuit Judge, holds that replacement benefits contract did not provide the disputed replacement benefits.
 Reversed.[Copyrighted Material Omitted]
 Dennis Houdek, Curan Callahan Gale & Houdek, LLP, New York, NY, for Plaintiff-Appellee.
 Paul J. Ondrasik, Jr. (Sara E. Hauptfuehrer, on the brief), Steptoe & Johnson LLP, Washington, D.C., for Defendant-Appellant.
 Before: WINTER, LEVAL, and STRAUB, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 William Aramony, the former Chief Executive Officer of United Way of America, brought this action against his former employer, after his dismissal by reason of fraud, to recover pension benefits allegedly due him. After a bench trial, the United States District Court for the Southern District of New York (Shira Scheindlin, J.) ruled in favor of Aramony, in part, and in favor of United Way, in part. See Aramony v. United Way of America, 28 F. Supp. 2d 147 (S.D.N.Y. 1998) ("Aramony I"). The parties appealed. We affirmed the judgment except insofar as it held that United Way was estopped from denying that Aramony was entitled to certain pension benefits under a Replacement Benefit Plan to replace benefits lost because of the 1986 enactment of Section 401(a)(17) of the Internal Revenue Code, which placed a cap on the annual compensation that can be taken into account by a qualified pension plan in calculating the benefits due to each employee. See Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140 (2d Cir. 1999) ("Aramony II"). On remand, the district court ruled that Aramony was entitled under the terms of the Replacement Benefits Plan to the disputed replacement benefits. See Aramony v. United Way of America, 86 F. Supp. 2d 199 (S.D.N.Y. 2000) ("Aramony III"). We reverse and remand for entry of judgment in favor of United Way.
 
 I. BACKGROUND
 
 2
 The background of this case is described in detail in the decisions of the district court, and in our September 1999 decision in the appeal from the district court's initial judgment. We restate it here only insofar as it is relevant to the issue presented in this appeal.
 
 
 3
 A. Aramony's Employment with United Way and United Way's Pension Plans
 
 
 4
 Aramony served from 1970 to 1992 as president and CEO of United Way of America, one of the nation's leading charitable organizations. In 1992, United Way terminated Aramony's employment amidst allegations that he had engaged in fraud and financial improprieties with respect to United Way funds. Aramony was convicted in 1995 in the United States District Court for the Eastern District of Virginia of numerous felony counts of fraud, and sentenced to seven years in prison.
 
 
 5
 During Aramony's tenure as President and CEO of United Way, United Way provided its employees with a qualified defined benefit plan under which pension benefits were calculated as a function of an employee's average salary over a five-year period. Under a 1982 amendment to the Internal Revenue Code, Section 415 of the Code set a limit of $90,000 (to be adjusted upwards for cost of living increases) on the benefits that an employee may receive each year under such a qualified benefit plan. See 26 U.S.C. § 415(b)(1)(A) (setting $90,000 limitation); 26 U.S.C. § 415(d) (providing for cost of living adjustments).
 
 
 6
 Section 415 reduced the benefits available to Aramony and other highly-paid United Way employees under United Way's qualified defined benefit plan. In order to offset the impact of Section 415 on United Way's highly-paid employees, the United Way Executive Committee met in February 1984 to consider adopting a non-qualified pension plan, titled the "Replacement Benefit Plan" or "RBP."
 
 
 7
 The general practice at United Way was for the Executive Committee to adopt the concept of a pension plan, but not to involve itself in the details of the plan. Details were worked out by Stephen Paulachak, a Senior Vice President of United Way, and Mutual of America Life Insurance Company ("Mutual"). Mutual was the entity with which United Way had signed a group annuity contract. Mutual also drafted United Way's pension plan documents and administered United Way's pension plans.
 
 
 8
 At the February 1984 meeting, Paulachak described the purposes of the RBP as: (1) to restore benefits lost because of the restrictions imposed by Section 415, and (2) to restore the pension benefits lost as a result of Rev. Rul. 80-359, which excluded deferred compensation from the definition of compensation under United Way's qualified benefit plan The minutes of the meeting show that the Executive Committee adopted Paulachak's recommendation and authorized United Way to establish an RBP. After a one-year delay, Mutual drafted a plan document for the RBP, and on May 16, 1985, Paulachak executed it on United Way's behalf.
 
 
 9
 As ultimately executed, the RBP is made up of nine articles, two of which are relevant here. Article I sets out the "Purpose of the Plan." It states in relevant part that
 
 
 10
 [t]his plan is being installed to provide a mechanism for securing the pension benefit promises made to [United Way's] management and highly compensated key employees who may receive relatively smaller retirement benefits under the existing pension arrang[e]ment than rank and file employees will receive as a result of limitations imposed by the Internal Revenue Code and rulings thereunder on the amount of pensions payable to the highly compensated.
 
 
 11
 Article V sets out the operative terms of the RBP. The relevant aspects of Article V are Sections 5.01 through 5.05. Sections 5.02, 5.03, and 5.04, which are set out in full in the margin,[1] each specify a particular formula for calculating contributions to the RBP. Section 5.02 provides a formula for calculating contributions to the RBP to replace benefits lost because of Section 415 of the Internal Revenue Code. Section 5.03 provides a formula for calculating contributions to the RBP to replace benefits lost because of the Revenue Ruling's exclusion of deferred compensation from the definition of compensation. Section 5.04 provides a formula for calculating contributions to the RBP to replace benefits lost because of both Section 415 and the exclusion of deferred compensation. Section 5.01 provides that United Way shall specify which of the formulas is applicable to each eligible group of participating employees. Finally, Section 5.05 provides that
 
 
 12
 The benefit to be provided under this Plan on behalf of each eligible Participant shall be the sum of (a) plus (b) below:
 
 
 13
 (a) the yearly contributions required pursuant to Section 5.02, 5.03, or 5.04, whichever is applicable, and
 
 
 14
 (b) any additional contributions or benefit amount that the Employer has agreed to pay to the Participant pursuant to either a contractual commitment or a resolution of the Board of Trustees of the Employer.
 
 
 15
 Approximately a year later, in 1986, as part of the Tax Reform Act of 1986, Congress enacted Section 401(a)(17) of the Code, which placed a cap of $200,000, subsequently reduced to $150,000, on the annual compensation that could be taken into account by a qualified plan in calculating the benefits due to each employee (subject to upward adjustments for cost of living increases). See 26 U.S.C. § 401(a)(17). Because Aramony's salary was in excess of the cap set forth in Section 401(a)(17), the effect of Section 401(a)(17) was to decrease the annual compensation that could be taken into account in calculating Aramony's pension benefits under United Way's qualified defined benefit plan.
 
 
 16
 In October 1988 and January 1989, Mutual sent Aramony estimates of his United Way pension benefits under both the qualified defined benefit plan and the RBP. Notwithstanding that the RBP does not mention the replacement of benefits lost because of Section 401(a)(17), estimates sent to Aramony indicated values that reflected the replacement not only of the benefits he lost because of Section 415, but also of the benefits he lost because of Section 401(a)(17).[2] In addition, Mutual prepared "Annual Valuation Reports" for United Way between 1988 and 1991 that estimated the expected value of Aramony's pension benefits. These Annual Valuation Reports, like the estimates that Mutual sent to Aramony, also included sums that resulted from an assumption that Aramony would receive replacement benefits for the benefits he lost because of Section 401(a)(17), as well as those he lost because of Section 415.
 
 
 17
 In 1990, the United Way Executive Committee convened to amend the RBP by adding a provision to replace benefits lost as a result of an unrelated change in the qualified defined benefit plan formula mandated by the Tax Reform Act of 1986. At that meeting, the Executive Committee agreed to amend the RBP by adding the replacement benefits traceable to that unrelated change, but no plan document incorporating the 1990 amendment was ever generated. The Executive Committee never discussed amending the RBP to provide replacement benefits for benefit reductions caused by the enactment of Section 401(a)(17).
 
 B. Prior Proceedings & Proceedings Below
 
 18
 As a consequence of Aramony's misconduct, United Way determined to deny Aramony pension benefits under both the RBP and a Supplemental Benefits Agreement ("SBA") into which United Way and Aramony had entered in 1984. Aramony brought this action pursuant to Section 502(a)(1)(B) of the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking, inter alia, declaratory judgment that he was entitled to the pension benefits. After a five-day bench trial, the district court issued a split decision explained by an opinion that we characterized in the first appeal as "lengthy, thoughtful, and meticulous." Aramony II, 191 F.3d at 146. The district court ruled that Aramony was entitled to recover benefits under the RBP, but that he was not entitled to recover benefits under the SBA. See Aramony I, 28 F. Supp. 2d at 166-68, 171-72. The district court also found that Aramony was liable to United Way under United Way's counterclaims for, inter alia, breach of fiduciary duty. See id. at 175-76.
 
 
 19
 On the issue whether the RBP included replacement benefits for pension benefit losses incurred because of Section 401(a)(17), the district court ruled in Aramony's favor because it found that United Way was estopped from arguing that the RBP did not include such benefits. The estoppel was found to result from the two reports sent by Mutual to Aramony in 1988 and 1989, which calculated Aramony's expected pension benefits in a manner that included in the RBP the replacement of benefits lost because of Section 401(a)(17). See Aramony I, 28 F. Supp. 2d at 169 ("The magnitude of these figures reveals Mutual's belief that Aramony's RBP benefits would make up for the effect of § 401(a)(17)....").[3] Moreover, the district court stated that the RBP "was ambiguous as to whether it was intended to compensate for the effects of § 401(a)(17)." Id. at 170. The court found that Aramony had reasonably relied to his detriment on the representations of Mutual, acting as United Way's agent, and that these facts satisfied the "extraordinary circumstances" requirement that we have established for promissory estoppel claims in the ERISA context. See id. at 170-71; see also Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 78-79 (2d Cir. 1996); Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). Accordingly, the district court ruled that Aramony was entitled under the RBP to replacement benefits for those benefits he lost because of the enactment of Section 401(a)(17). See id. at 171.
 
 
 20
 Both parties appealed. We affirmed the district court's judgment with respect to all questions except the issue of the Section 401(a)(17) make-up benefits under the RBP. See Aramony II, 191 F.3d at 147-56. On the question of Section 401(a)(17) replacement benefits, we held that Aramony had not satisfied the requirement to show "extraordinary circumstances" to justify promissory estoppel in ERISA cases. We stated that neither ambiguity in a plan's terms alone, nor ambiguity in combination with the "promise element of ordinary estoppel analysis," constituted an extraordinary circumstance. Id. at 152-53. Accordingly, we reversed the district court's determination that United Way "is estopped from denying that the RBP provides a benefit offsetting the effect of § 401(a)(17)." Id. at 153. Rather than grant judgment to United Way on this issue, however, we remanded to the district court for consideration of the scope of the RBP as a matter of contract law:
 
 
 21
 As part of its estoppel analysis, the district court decided, however, that the RBP was ambiguous on this point. We remand, therefore, so that the district court may consider whether United Way is contractually bound by the RBP itself to provide the benefit to Aramony.
 
 
 22
 Id.
 
 
 23
 On remand, the district court again ruled in Aramony's favor. The court explained that there is a "'conflict between the plan's stated purpose'" in Article I of the RBP, on the one hand, "'and the effect of § 401(a)(17),'" on the other. Aramony III, 86 F. Supp. 2d at 203 (quoting Aramony I, 28 F. Supp. 2d at 170). In particular, the court reasoned that "it is not clear from the language of the RBP that the general statement of purpose in Article I [of the RBP] does not include the limitation on pension benefits contained in § 401(a)(17)," and that such "ambiguity is reinforced by the fact that § 401(a)(17) takes away some of the § 415 make-up benefit explicitly mentioned in § 5.02 [of the RBP]." Id. at 204. Moreover, the district court explained that the "'absence of any mention of 401(a)(17) from the [RBP]'" is not determinative of the RBP's scope because the RBP was executed before the enactment of Section 401(a)(17). Id. at 203 (quoting Aramony I, 28 F. Supp. 2d at 170 n.24). Finally, the district court reasoned that the terms of the RBP are ambiguous on their face with respect to Section 401(a)(17) benefits because "even if the purpose of the RBP was simply to provide a full make-up benefit for § 415, the failure to offset the limitation contained in § 401(a)(17) would frustrate this purpose." Id. at 204.
 
 
 24
 The district court thus turned to extrinsic evidence to construe the terms of the plan and concluded that the parties' conduct after the execution of the RBP demonstrated that the parties understood the RBP to provide replacement benefits for pension benefit reductions caused by Section 401(a)(17). In particular, the court referred to two pieces of extrinsic evidence to support this view. First, in 1990 the United Way Executive Committee increased Aramony's annual salary from $345,000 to $365,000, stating a purpose "'to maintain growth in [his] pension base.'" Aramony III, 86 F. Supp. 2d at 205. Unless the RBP included Section 401(a)(17) replacement benefits, however, an increase in Aramony's salary would not have increased his pension base because Section 401(a)(17) had capped at $150,000 the annual earnings that could be taken into account in calculating qualified defined benefit plan benefits. See id. at 205. Second, Mutual's "Annual Valuation Reports" to United Way calculated Aramony's pension benefits as if the RBP included 401(a)(17) replacement benefits. The benefit figures calculated in the Reports were consistent with the view that the RBP included Section 401(a)(17) make-up benefits, and a former executive of Mutual testified that in 1992 he had informed United Way that Mutual believed that the RBP compensated Aramony for benefits that were lost as a result of Section 401(a)(17). See id. at 206. On the basis of this evidence, the district court concluded that the "extrinsic evidence conclusively demonstrates that [United Way] thought that the RBP did provide an offset of § 401(a)(17)." Id. The court therefore held that United Way "'is contractually bound by the RBP itself to provide the benefit to Aramony.'" Id. (quoting Aramony II, 191 F.2d at 153).
 
 II. DISCUSSION
 
 25
 On appeal, United Way argues (1) that the district court erred in interpreting the RBP as ambiguous, and (2) that the RBP can be read reasonably only as not providing Section 401(a)(17) replacement benefits. We agree.
 
 
 26
 A. The Law of the Case Doctrine Does Not Bar Our Consideration of Whether the RBP Is Ambiguous
 
 
 27
 As a threshold matter, we reject Aramony's contention that the law of the case bars us from ruling that the RBP is not ambiguous. The doctrine of the law of the case "'posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case.'" In re Crysen/Montenay Energy Co., 226 F.3d 160, 165 n.5 (2d Cir. 2000), cert. denied, 121 S. Ct. 1356 (2001) (quoting Sagendorf Teal v. County of Rensselaer, 100 F.3d 270, 277 (2d Cir. 1996)). Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication. See 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478, at 789 (1981). "Application of the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." In re Crysen/Montenay, 226 F.3d at 165 n.5 (quoting Sagendorf-Teal, 100 F.3d at 277) (internal quotation marks omitted).
 
 
 28
 Aramony argues that in our decision in Aramony II, 191 F.3d at 150-53, we necessarily held that the RBP is ambiguous. First, he argues that we so held when we affirmed the district court's decision in Aramony I to resort to extrinsic evidence to resolve an ambiguity in the RBP unrelated to the question now at issue in this case.[4] A contract that is ambiguous in one respect, however, need not be ambiguous in another, and nothing we said in Aramony II about an unrelated ambiguity in the RBP has any bearing on the question now before us.
 
 
 29
 Second, Aramony argues that we necessarily held that the RBP is ambiguous as to the question of 401(a)(17) replacement benefits when we reversed the district court's estoppel decision and remanded for further consideration whether the RBP provides 401(a)(17) replacement benefits as a matter of contract law. In Aramony I, the district court stated that the RBP is "ambiguous as to whether it was intended to compensate for the effects of § 401(a)(17)," and went on to rule that the doctrine of promissory estoppel barred United Way from denying the replacement of benefits lost because of Section 401(a)(17). Aramony I, 28 F. Supp. 2d at 170. On appeal, we held that the district court erred in finding an estoppel. We recited that the district court had concluded that "the RBP is ambiguous" on the question of 401(a)(17) benefits. Aramony II, 191 F.3d at 151-52. But we explained that the "combination of ambiguity - which we have concluded does not alone suffice to establish extraordinary circumstances - and the promise element of ordinary estoppel" did not suffice to establish the "extraordinary circumstances" necessary to prevail in an estoppel claim. See id. at 152-53. We then noted once again that the district court had concluded that the "RBP was ambiguous on this point." Id. at 153. We remanded for the district court to "consider whether United Way is contractually bound by the RBP itself to provide the benefit to Aramony." Id.
 
 
 30
 Aramony argues that in these passages we both expressly and necessarily held the plan to be ambiguous as to whether it replaced benefits lost because of Section 401(a)(17). In support of the contention that we expressly so ruled, he points to our statement that the "combination of ambiguity... and the promise element of ordinary estoppel analysis does not meet the [extraordinary circumstances] standard... either." Aramony II, 191 F.3d at 152-53. In support of the contention that we necessarily so ruled, he argues that, had we not found ambiguity, we would have proceeded to decide the meaning of the contract ourselves rather than remand. We disagree with both contentions.
 
 
 31
 As to the express text, we read the opinion of our predecessor panel differently. Repeatedly it stated that the district court had found the provisions ambiguous. Because such ambiguity as the district court found, together with the misleading benefit estimates, did not justify the district court's conclusion of promissory estoppel, we remanded for consideration of the rights as provided by the contract. Our discussion of ambiguity referred to the ambiguity as found by the district court - not to any conclusion of our own that the plan was ambiguous as a matter of law.
 
 
 32
 As to the argument that a finding of ambiguity was necessarily implicit in our remand, Aramony is correct that, having rejected the district court's estoppel analysis, we could have resolved the meaning of the contract ourselves without remand, had we found it unambiguous. We could have, but we were under no obligation to do so. Because the district court had initially relied on estoppel, it had never made a determination of contract rights. The fact that we remanded to the district court for an initial determination of the meaning of this complex contract in no way implies that we found it ambiguous as a matter of law. A court of appeals's understanding of a complex matter is immensely benefitted by the district court's prior consideration. No inference of a finding of ambiguity can be drawn from the fact of the remand.
 
 
 33
 In any event, as noted above, application of the doctrine of law of the case is discretionary and does not limit a court's power to reconsider its decisions. See In re Crysen/Montenay, 226 F.3d at 165 n.5. For these numerous reasons, we reject Aramony's contention that this court is bound to consider the RBP ambiguous.
 
 B. The Terms of the RBP Are Unambiguous
 
 34
 Interpretation of the terms of an ERISA pension plan is governed by the "federal common law of rights and obligations under ERISA-regulated plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989) (internal quotation marks omitted); see also Schonholz, 87 F.3d at 79 ("ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans."); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir. 1995). In applying these principles, we interpret and enforce "unambiguous language in an ERISA plan" according to its "plain meaning." Aramony II, 191 F.3d at 149. "'Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" Id. (quoting O'Neil v. Retirement Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir. 1994)). In making a determination of ambiguity, "reference may not be had to matters external to the entire integrated agreement." Id. We review determinations as to the ambiguity of an ERISA plan provision de novo. See id.
 
 
 35
 We disagree with the district court's conclusion that the language of the RBP is ambiguous as to whether it replaces benefits lost because of Section 401(a)(17). As we read it, the RBP does not provide such benefits. The RBP explicitly provides for contributions to replace benefits lost because of Section 415 and / or benefits lost because of the Revenue Ruling's exclusion of deferred compensation. Nothing in the operative terms of the RBP makes any reference to replacement of benefits lost because of any subsequent changes in the Internal Revenue Code. The plan, of course, could have been drafted to replace benefits lost as the result of future changes in the Internal Revenue Code. For example, such a replacement benefit plan might have provided for contributions calculated by subtracting the amount actually contributed under the defined benefit plan from the contribution that would have been made under the qualified defined benefit plan but for future changes in the Internal Revenue Code limiting contributions. The RBP does not do this. Instead, Section 5.02 of the RBP measures contributions to the RBP by subtracting the amount actually contributed to the defined qualified benefit plan from "the contribution that would have been made [under the qualified defined benefit plan]" but for the "limitation on the annual addition imposed by Section 415 of the Internal Revenue Code." In like manner, Section 5.03 measures contributions to the RBP by subtracting the amount actually contributed from the "contribution that would have been made [under the qualified defined benefit plan] if such contributions had been based on compensation inclusive of amounts deferred." The RBP is extremely precise. It defines the scope of the replacement benefits with clarity and precision, in a manner that does not include benefits to be lost because of future amendments to the Internal Revenue Code. It makes no reference of any kind, vague or precise, that might encompass the later-enacted Section 401(a)(17).
 
 
 36
 The district court believed ambiguity resulted from the general provision set forth in Article I under the caption "Purpose of the Plan." As noted above, the purpose described is "to provide a mechanism for securing the pension benefit promises made to... highly compensated key employees who may receive relatively smaller retirement benefits under the existing pension arrangement than rank and file employees will receive as a result of limitations imposed by the Internal Revenue Code and rulings thereunder on the amount of pensions payable to the highly compensated."
 
 
 37
 Of course, it is true that the words "receive... smaller... benefits... as a result of limitations imposed by the Internal Revenue Code," if read in isolation, could refer to future limitations imposed by the Code, as well as to limitations already imposed by the Code. But when this vague provision is read in conjunction with the highly detailed provisions in Article V, specifying with precision how replacement benefits are to be calculated - in each case in relation to limitations already imposed - the finding of ambiguity becomes improbable and unreasonable. This was clearly a contract written in detailed and precise terms that intended to make its meanings unmistakably clear. Nothing in the contract supports the notion that the phrase "imposed by the Internal Revenue Code" intended to refer to continuing changes that might in the future be "imposed by the Internal Revenue Code." To the contrary, all of the plan's details reinforce the understanding that the word "imposed" carries its most natural meaning: as a reference to limitations that have been "imposed" before the execution of the plan.
 
 
 38
 Thus, if the plan's instructions had spoken in terms as vague as the language of the Purpose of the Plan provision and instructed that the employer's contributions to the replacement benefit plan would be determined by subtracting contributions actually made to the qualified defined benefit plan from the contributions that would have been made but for "limitations imposed by the Internal Revenue Code," we would agree that such a promise might be ambiguous as to whether it intended to encompass limitations to be imposed in the future. But because the plan specifies with such clarity which tax provisions are to be taken into account, we find it unreasonable to treat the imprecision of the general purpose clause as overriding the specificity of the detailed computation clauses. Contracts would offer very little protection to their signatories if ambiguities of the sort found in the purpose clause could take precedence over carefully spelled out terms.
 
 
 39
 Our conclusion that the RBP does not provide replacement benefits for those benefits lost as a result of Section 401(a)(17) corresponds with two well-established guidelines in the law of contract construction. First, we have held that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, 'it cannot create any right beyond those arising from the operative terms of the document.'" Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985) (quoting Genovese Drug Stores v. Connecticut Packing Co., 732 F.2d 286, 291 (2d Cir. 1984)); see also Credit Lyonnais v. Getty Square Assocs., 876 F. Supp. 517, 521 (S.D.N.Y. 1995). Article I of the RBP, captioned "Purpose of the Plan," is analogous for these purposes to a contract's "whereas" clauses.
 
 
 40
 Second, it is a fundamental rule of contract construction that "specific terms and exact terms are given greater weight than general language." Restatement (Second) of Contracts § 203(c) (1981); see also Jamie Sec. Co. v. The Limited, Inc., 880 F.2d 1572, 1576-77 (2d Cir. 1989); Arthur Linton Corbin, Corbin on Contracts §§ 545-54, at 521 (1952) ("[W]ords of general description should generally yield to words that are more specific.").[5] Even where there is no "true conflict" between two provisions, "specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." 11 Richard A. Lord, Williston on Contracts § 32:10, at 449 (4th ed. 1999); see also Kayfield Constr. Corp. v. United States, 278 F.2d 217, 219 (2d Cir. 1960) (interpreting a contract by its more specific terms rather than by "the general language of... other paragraphs"); Friedrich v. Local No. 780, 515 F.2d 225, 227-28 (5th Cir. 1975) (general language of one paragraph limited by specific language in subsequent paragraphs); G.T. Schjeldahl Co. v. Local Lodge 1680, 393 F.2d 502, 504 (1st Cir. 1968) (same). Thus, even if the general language of Article I, considered in isolation, is broad enough to manifest a generalized intent to replace benefit reductions caused by future limitations imposed by the Internal Revenue Code, Article I's broad language is limited by the specific operative language of Article V, which provides only for the replacement of benefit reductions caused by specific existing tax provisions.
 
 
 41
 The district court also reasoned that "the failure to offset the limitation contained in § 401(a)(17) would frustrate [the RBP's] purpose [of providing a full make-up benefit for § 415]." Aramony III, 86 F. Supp. 2d at 204; see also id. at 203 ("401(a)(17) deprives Aramony of the pension benefit promises made by [United Way]."); id. at 204 ("[T]he ambiguity is reinforced by the fact that § 401(a)(17) takes away some of the § 415 make-up benefit explicitly mentioned in § 5.02."). It is certainly true that Aramony's aggregate pension benefits became smaller after Congress passed Section 401(a)(17), limiting Aramony's benefits in a manner not covered by the Replacement Benefit Plan. But that did not change the clear meaning of the RBP. It was always within contemplation that, just as Congress had limited qualified pension benefits with the passage of Section 415, it might do so again in unforeseeable ways. Aramony knew, or should have known, that the RBP as drafted did not protect against that risk. He could of course have bargained for broader protection. But the RBP is the contract he had, and he is bound by its terms, which unambiguously do not replace benefits lost as the result of the passage of Section 401(a)(17).
 
 CONCLUSION
 
 42
 The judgment in plaintiff's favor is vacated and the matter remanded for entry of judgment in favor of the defendants.
 
 
 
 NOTES:
 
 
 [1]
 Section 5.02 (Excess over Section 415 Limit). The contribution to be made to this Plan, in each Plan Year, on behalf of each eligible Participant, shall be equal to the difference between:
 (a)the contribution that would have been made on behalf of such Participant under the Pension Plan sponsored by the Employer without the limitation on the annual addition imposed by Section 415 of the Internal Revenue Code, and
 (b)the amount that has actually been contributed on such Participant's behalf and allocated to his individual account under that Plan.
 Section 5.03. (Deferred Compensation). The contribution to be made to this Plan, in each Plan Year, on behalf of each eligible Participant, shall be equal to the difference between:
 (a) the contribution that would have been made on behalf of such Participant under the Pension Plan sponsored by the Employer, if such contribution had been based on compensation inclusive of amounts deferred pursuant to an agreement between the Employer and the Participant, and
 (b)the amount that has actually been contributed on such Participant's behalf and allocated to his individual account under that Plan.
 Section 5.04. (Section 415 plus deferred compensation). The contribution to be made to this Plan, in each Plan Year, on behalf of each eligible Participant, shall be equal to the difference between:
 (a)the contribution that would have been made on behalf of such Participant under the Pension Plan sponsored by the Employer if the amount of such contribution:
 (i) had been based on compensation inclusive of amounts deferred pursuant to an agreement between the Employer and the Participant, and
 (ii) was not limited by the annual addition permitted to be made pursuant to Section 415 of the Internal Revenue Code, and
 (b) the amount that has actually been contributed on such Participant's behalf and allocated to his individual account under that Plan.
 
 
 [2]
 The reports sent by Mutual to Aramony did not expressly state that the RBP benefits included Section 401(a)(17) replacement benefits, but the values set forth in the reports were derived from a computation that included them.
 
 
 [3]
 As noted above, the reports did not expressly state that the RBP included Section 401(a)(17) replacement benefits, but the values reported in the reports so implied.
 
 
 [4]
 The RBP as ultimately executed was drafted as if United Way had a qualified defined contribution plan, when in fact it had a qualified defined benefit plan. At trial, one of the issues was whether the RBP's reference to a non-existent contribution plan renders the RBP meaningless. The district court ruled that the RBP is ambiguous on this point and made reference to extrinsic evidence in order to hold that the RBP intended to make reference to the United Way qualified defined benefit plan. We affirmed. See Aramony II, 191 F.3d at 150.
 
 
 [5]
 We have characterized this rule of contractual construction as a "guide[] to interpretation" rather than a "rule[] requiring blind adherence" where the specific term in question is susceptible of two reasonable interpretations. Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir. 1990) (holding that contract terms were ambiguous where the specific term that appellant argued should control a more general term was itself susceptible of two reasonable interpretations). In this case, however, the specific terms are susceptible of only one reasonable interpretation.