**DEVAN MOTORS OF FAIRFIELD, INC. d/b/a Infiniti of Fairfield, Plaintiff,**

v.

**INFINITI DIVISION OF NISSAN NORTH AMERICA, INC., Defendant.**

**Civ No. 3:04CV00308 (AWT).**

United States District Court, D. Connecticut.

Sept. 29, 2008.

Frank X. Trainor, III, Richard N. Sox, Jr., Myers & Fuller, P.A., Raleigh, NC, Gary Scott Klein, Jay H. Sandak, Marc J. Kurzman, Peter M. Nolin, Sandak Hennessey & Greco, Stamford, CT, Robert C. Byerts, Myers & Fuller, PA, Tallahassee, FL, for Plaintiff.

Denise R. Polivy, William J. O'Sullivan, Baker O'Sullivan & Bliss PC, Wethersfield, CT, M. Ronald McMahan, Jr., S. Keith Hutto, Steven A. McKelvey, Nelson, Mullins, Riley & Scarborough, Columbia, SC, for Defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

ALVIN W. THOMPSON, District Judge.

The plaintiff, Devan Motors of Fairfield, Inc. d/b/a Infiniti of Fairfield ("Devan"), brings this action against the defendant, Infiniti Division of Nissan North America, Inc. ("Infiniti"), alleging violations of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et seq.* ("CUTPA"), breach of contract, and breach of the implied covenant of good faith and fair dealing. The defendant has moved for summary judgment. For the reasons set forth below, the defendant's motion is being granted as to the breach of contract claim and denied as to the other claims.

## I. FACTUAL BACKGROUND

### A. Devan's Negotiations with Infiniti to Purchase the New Country Dealership

In late 2001, Michael Cantanucci ("Cantanucci") decided to sell the assets of New Country Infiniti ("New Country"), a dealership he owned in Greenwich, Connecticut. Jonathan Brostoff ("Brostoff") and Marc Blitzer ("Blitzer"), the principals of Devan, entered into negotiations with Cantanucci for the purchase of New Country. Brostoff and Blitzer could not find another

location in Greenwich from which to operate the Infiniti dealership.[1] Therefore, they proposed to purchase New Country and relocate the dealership to a site on Post Road in Fairfield, Connecticut, approximately 20 miles away from the Greenwich site.

On December 31, 2001, Brostoff and Blitzer entered into a lease agreement for the property on Post Road in Fairfield. The lease had a term of four and one-half years with two five-year extension options. On January 28, 2002, Brostoff and Blitzer entered into an Asset Purchase Agreement to buy the assets of New Country. Pursuant to this agreement, the purchase price for New Country's customer lists and dealership goodwill was $725,000. The lease agreement and the Asset Purchase Agreement were both contingent on Infiniti's approval of the purchase and relocation of the dealership to Fairfield.

On January 29, 2002, Cantanucci submitted the proposal to Infiniti's regional office. Initially, the proposal caused some concerns for Infiniti because of the twenty-mile relocation. Ed Sherman ("Sherman"), Infiniti's East Region Vice President, recommended maintaining Greenwich as an "open point" for placement of another dealer.[2] Correspondence dated

January 30, 2002 from John Busch ("Busch"), a market studies planner, to Mike Leiter ("Leiter"), a market studies manager, summarized the East Region's proposal as follows:

The Region's proposal would be that if the buy/sell of New Country Infiniti and subsequent relocation were to be approved, that the Fairfield PMA [Primary Market Area] replace the Danbury Open Point and keep Greenwich as a separate PMA for the possibility of future Infiniti representation. I think this proposal would require an in-field market study in order to better analyze the situation and review the Metro and surrounding Infiniti markets.

(Pl.'s Ex. 5 (Doc. No. 197)).[3] In a January 31, 2002 email to Mark McDowell ("McDowell"), a market representation manager, Leiter stated:

Market Study's would support the proposed relocation from Greenwich to Fairfield from a location standpoint. However, because the relo distance is substantial (20.5 air miles) a realignment of PMA's would be necessary ... an infield market study would probably come to the conclusion that the market should be realigned to include a White Plains PMA, the Fairfield PMA, the

1. Cantanucci planned to expand the service department of another dealership he owned into the space that was occupied by New Country, and there were no other available sites for an Infiniti dealership at the time within the town of Greenwich.

2. An "open point" is an area which the company is seeking to fill with a dealer. See Def.'s Ex. 4 (Doc. No. 188) at 17; Pl.'s Ex. 12 (Doc. No. 197) at 22; Pl.'s Ex. 18 at 110. A "monitored point" or a "monitored market" is an area that is being studied or evaluated for the possibility of placing a dealership there in the future. See Def.'s Ex. 4 at 19; Pl.'s Ex. 12 at 23; Pl.'s Ex. 19 at 55. A "closed point" is an area that is no longer available as a dealership location because a

dealer has been placed there or because an open point designation is not warranted. See Def.'s Ex. 4 at 19–20; Pl.'s Ex. 12 at 21; Pl.'s Ex. 13 at 39–40.

3. A dealer's Primary Market Area ("PMA") is a defined by Infiniti's Dealer Sales and Service Agreement as "the geographic area which is designated from time to time as the area of Dealer's sales and service responsibility for Infiniti Products in a Notice of Primary Market Area issued by Seller to Dealer." (Pl.'s Ex. 25 at § 1K). In his deposition, Sherman agreed that the Region proposed to keep Greenwich as a separate PMA, but did not recall discussing the Danbury open point.

New Haven PMA and a Monitored Market/Open Point in Greenwich. (Pl.'s Ex. 16). Infiniti contacted three other dealers to determine whether they were interested in acquiring New Country and remaining in Greenwich.[4] Because there were no facilities available for a dealership in Greenwich, Infiniti's efforts to maintain a franchise there were unsuccessful. On February 25, 2002, John Manfra ("Manfra"), the assistant manager of Infiniti's local region, informed McDowell that "there is no viable solution to acquiring an alternative location in Greenwich" and recommended proceeding with the "Cantanucci buy/sell re-location proposal." (Pl.'s Ex. 15).

Brostoff claims that, prior to the closing, he had several conversations with Infiniti representatives that misrepresented the company's intentions with respect to the Greenwich dealership. In April 2002, McDowell told Brostoff that Devan was "replacing the Greenwich dealer, except for the town of Greenwich," which would be reassigned to Pepe Infiniti ("Pepe") in White Plains, New York. (Def.'s Ex. 2 (Doc. No. 188) at 102). Infiniti provided Brostoff with maps reflecting this alignment. In April 2002, Manfra told Brostoff, "You are now the Greenwich dealership. You're moving the Greenwich dealership." (*Id.* at 109). In addition, Manfra and Marc McNabb ("McNabb"), former Infiniti Vice President and General Manager, told Rich Fisher ("Fisher"), the former General Manager of Devan, that the Greenwich point was "closed." (Def.'s Ex. 11 at 272, 274). During these conversations, however, Infiniti representatives never told Brostoff or Fisher that Infiniti would not reopen another dealership in Greenwich after Devan's relocation to Fairfield.[5]

In late April 2002, Infiniti approved Devan's purchase of New Country and its relocation to Fairfield. On April 23, 2002, McDowell sent a letter to Cantanucci, Brostoff, and Blitzer, advising them of Infiniti's approval of the proposal and its

---

4. Brostoff claims that Infiniti withheld important information obtained in a February 20, 2002 meeting with Ron Pecunies ("Pecunies"), the owner of a Cadillac dealership next to New Country. A memorandum from Infiniti's John Manfra noted that Pecunies stated the following: "Currently, Infiniti's R.O.I. is not attractive. The Greenwich rent factor is high. The Infiniti net profit is low. Might look more favorably on Infiniti in the future based on success of new product plan. Needs to expand Mercedes facility. Did approx. 1800 units last year. Mr. Pecunies owns the Cadillac facility across the street from New Country Infiniti. Tenant's lease expires in 18 months. Mr. Pecunies plans to expand Mercedes into the current Cadillac Facility." (Pl.'s Ex. 14). The memorandum concludes that "Mr. Pecunies has minimal interest and no available facility in Greenwich." (*Id.*).

5. Initially, Fisher submitted an affidavit, in which he averred, "Mr. Manfra told me that Infiniti would not reopen a new Greenwich Infiniti store if Devan's relocation of the Greenwich dealership to Fairfield was approved.... When I again raised the issue of Infiniti opening a new store in Greenwich, Mr. Manfra told me that Infiniti had 'given up the right to open a store in Greenwich.' I had several further conversations on the same topic with Mr. Manfra in which he consistently responded that 'Greenwich' had been closed and could not be reopened after the 'Point' was relocated to Fairfield." (Pl.'s Ex. 39, ¶¶ 9–10). Fisher also averred that he told McNabb that his "only concern was over the possibility that Infiniti would open a new store in Greenwich and thereby undermine the relocated Fairfield dealership. Mr. McNabb told me that would not happen, because the Greenwich Point had been closed." (*Id.* ¶ 11). However, in a subsequent deposition, Fisher testified that "Mr. Manfra never said that Infiniti could never reopen a point" and that McNabb never said that the Greenwich point could not and would not be reopened. (Def.'s Ex. 11 at 272, 274). Fisher testified that the language in his affidavit was added by Devan's attorneys.

intention to enter into a Dealer Term Sales and Service Agreement (the "Agreement") with Devan. The letter also states that Infiniti would be "evaluating the impact of [the] relocation on the definition of the resulting Primary Market Area for Buyers." (Def.'s Ex. 6). On April 29, 2002, Brostoff signed a written acknowledgment confirming that Greenwich would not be located within Devan's PMA because it would be assigned to Pepe. Devan would have the rest of the market area previously assigned to New Country.

## B. Devan's Agreement With Infiniti

On April 30, 2002, the Agreement was signed by Devan and Infiniti. At the time he entered into the Agreement, Brostoff had been involved in the ownership and operation of another automobile dealership for several years and had previously entered into similar agreements with other manufacturers. The "Introduction" to the Agreement stated in part: "Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the consuming public." (Pl.'s Ex. 25 at 1). The "Introduction" to the Agreement also stated in part: "Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Dealer or Infiniti Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities." (Id.).

The Agreement contained the following provisions relating to dealership location and facilities:

Section 2. Dealership Location and Dealership Facilities

A. Location and Facilities

Dealer shall provide, at the Dealership Location approved by the Seller in accordance with Section 2.B hereof, Dealership Facilities that (i) will enable Dealer to effectively perform its responsibilities under this Agreement; (ii) are satisfactory in space, appearance, layout, equipment, signage; and (iii) are otherwise substantially in accordance with the Guides and Standards therefor established by Seller and the Facilities Standards Manual, as the same may be issued to Dealer from time to time. Dealer shall conduct its Dealership Operations only from the Dealership Location specified in the Dealership Facilities Addendum.

B. Dealership Facilities Addendum

Dealer and Seller will execute a Dealership Facilities Addendum which will include a description of the Dealership Location and the Dealership Facilities, the approved use for each such place of business and facility, and the current Guides therefor.

C. Changes and Additions

Dealer shall not move, relocate or change the usage of the Dealership Location or any of the Dealership Facilities, or substantially modify any of the Dealership Facilities, nor shall Dealer ... directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Infiniti Products or for the conduct of any other of the Dealership Operations contemplated by this Agreement, without the prior written consent of the Seller. Any changes in the Dealership Location or in the Dealership Facilities that may be agreed to by Seller and Dealer shall be reflected in a new, superseding Dealership Facilities Addendum executed by Seller and Dealer ...

D. Development of Market Studies

Seller may, from time to time and in its sole discretion conduct studies of various geographic areas to evaluate market conditions.... Such studies will

make recommendations concerning the market, the Dealership Facilities, and the Dealership Location. Prior to conducting a study which includes the geographic area in which the Dealer's Primary Market Area is located, Seller will notify Dealer of its intention to conduct such a study. Dealer will be given the opportunity to present to Seller such information pertaining to such study as Dealer believes may be relevant. Seller will consider all relevant information timely provided by Dealer before concluding its study.

E. Evaluation of Dealership Facilities and Location

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2. In making such evaluations, Seller will give consideration to: the actual land and building space provided by Dealer for the performance of its responsibilities under this Agreement; the current Guides and Standards established by Seller for the Dealership Facilities; the appearance, condition and layout of the Dealership Facilities; the location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area; and such other factors, if any, as may directly relate to Dealer's performance of its responsibilities under this Section 2. Evaluations prepared pursuant to this Section 2.E will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations, and Seller will consider Dealer's comments. Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 2.

(*Id.* at § 2). The Agreement specified the sales obligations of the dealer as follows:

Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail (and if Dealer elects, the leasing and rental) of Infiniti Vehicles to customers located within Dealer's Primary Market Area.... Dealer agrees that it has no exclusive right or interest in any such geographic area which Seller may designate; that Seller may add, relocate or replace dealers in Dealer's Primary Market Area; and that Seller may, in its reasonable discretion, change Dealer's Primary Market Area from time to time.

(*Id.* at § 3A). The Agreement also contained a merger clause, which provided:

This Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein and may be amended only by a written instrument executed by each of the parties or their respective personal representative, successors, and/or assigns. This Agreement supercedes any and all prior agreements with respect to the subject matter hereof, and there are no restrictions, promises, warranties, covenants or undertakings between the parties other than those expressly set forth in this Agreement.

(*Id.* at § 15E). The Agreement did not contain any representation by Infiniti that it would not approve a new Greenwich dealer for any specific period of time, and Devan did not request any exception to the Agreement that would prevent Infiniti from adding a dealer in Greenwich after its relocation to Fairfield. Notwithstanding the language of the Agreement, Brostoff believed that Infiniti's representation that Devan replaced the Greenwich dealership was fundamental to the Agreement.

Devan began operating the Fairfield dealership in May 2002. On May 1, 2002, Infiniti sent a letter to the Commissioner of the Department of Motor Vehicles for the State of Connecticut (the "DMV"), stating:

Devan Motors of Fairfield, Inc. dba Devan Infiniti of Fairfield is a replacement dealer for New Country Motor Cars of Greenwich, Inc. dba New Country Infiniti of Greenwich.... Subsequent to the relocation, Infiniti will change Devan Motors of Fairfield, Inc. dba Devan Infiniti of Fairfield's area of responsibility and it will no longer include Greenwich and surrounding census tracks.

(Def.'s Ex. 13). On May 2, 2002, Infiniti contacted George Harte ("Harte"), the owner of an Infiniti dealership in West Haven, Connecticut, to inform him that Devan and Infiniti had entered into the Agreement. At that time, Sherman explained to Harte "that the Fairfield dealership was not an additional dealership, but rather the relocation of a current dealer." (Pl.'s Ex. 26). Brostoff claims that he had a discussion with McNabb, in November 2002, in which he was again informed about Infiniti's intentions with respect to a dealership in Greenwich. Specifically, McNabb "told [Brostoff] that Ed Sherman had wanted to have [Brostoff] buy the dealership, move it to Fairfield, and then put another dealer in Greenwich. But [McNabb] would not allow it." (Pl.'s Ex. 2 at 121). On April 11, 2003, Devan and Infiniti entered into a permanent Dealer Sales and Service Agreement, which contained the same relevant provisions as the Agreement, which had been signed on April 30, 2002.

## C. Infiniti's 2003 Market Study and its Implications

In early to mid–2003, Infiniti began a market study of the New York Demo-graphic Market Area, including Fairfield County, to determine whether an adjustment was required to its dealer network.[6] The study was performed in three segments, with the Fairfield County portion of the study beginning around September 2003.[7] In August 2003, Stephen Burack ("Burack"), Infiniti's Dealer Operation Manager, called Brostoff to inform him of the market study. On August 27, 2003 Gary Frigo ("Frigo"), Vice President of Infiniti's East Region, advised Brostoff that Infiniti would be conducting a market study in the Fairfield area and invited him to provide any information relating to the study within thirty days. On September 4, 2003, Brostoff responded to the letter with his comments about the study and stated that Devan would be exploring opportunities to relocate within Fairfield County. In August or September 2003, Burack called Ron Pecunies ("Pecunies") to discuss his interest in opening an Infiniti dealership in Greenwich. Subsequently, Burack and Pecunies exchanged documents related to the acquisition by Pecunies of a franchise in Greenwich.

In October 2003, Infiniti's market study was released. The study's executive summary notes that one of its purposes was to "assess the viability of the Greenwich CT, New Rochelle/Longmont NY, Wappingers Falls N.Y. and the Mt. Kisco/Goldens Bridge N.Y. market's [sic] for possible Infiniti representation." (Pl.'s Ex. 32). The study recommended declaring an open point in Greenwich. Specifically, it concluded:

---

6. Gary Frigo of Infiniti testified that the study was conducted because of (1) the size of the New York market, (2) the relatively poor performance of the New York region when compared to national market share averages, (3) the absence of such a study within the past decade, (4) the changing nature of the fran-chise, and (5) the boom in the luxury car market.

7. The Northern New Jersey and New York City portions of the study were conducted earlier in 2003, although it is unclear exactly when they were commenced.

Devan Infiniti should provide exclusive, stand alone Infiniti sales, service and parts facilities, at the current location.... Infiniti Division should establish exclusive stand alone Infiniti sales, service and parts facilities in the Greenwich CT market. The preferred location is in the vicinity of the existing Greenwich Cadillac Olds facility on W. Putnam Avenue in Greenwich.

(Pl.'s Ex. 33). The study concluded that placing a dealership in Greenwich would increase Infiniti's market representation in Fairfield County.

In November 2003, Infiniti informed Pecunies of the results of the study, and Pecunies continued the process of securing approval for his dealership site in Greenwich. On December 22, 2003, Infiniti sent Pecunies a letter of commitment to enter into a dealer agreement for a dealership at 217 West Putnam Avenue in Greenwich. On January 6, 2004, Infiniti first informed Brostoff of the results of the market study.

Devan's expert, Robert B. Dilmore, Sr. ("Dilmore"), concluded that Infiniti's market study was deficient in several respects. First, he concluded that the market study did not comply with industry standards due to the following factors:

the placement would occur at a point from which an existing dealer purchased and then relocated his dealership, the existing dealer was not provided with notice of the initiation of the market study, the existing dealer was not provided with notice of the purpose of the study, the manufacturer did not provide information about the impact of placing a dealer back into a town from which the existing dealer had purchased his dealership, and the existing dealer was not offered an opportunity to provide the additional location.

(Pl.'s Ex. 37 at 7). Second, he concluded that Infiniti failed to provide Devan with an adjustment period before evaluating the market:

Under normal circumstances a period of eighteen (18) to twenty-four (24) months is generally provided to a new dealer before the manufacturers and distributors expect the dealer to demonstrate sales success in the market.... If a manufacturer or distributor conducts a market study during the eighteen (18) to twenty-four (24) month time period following a change of ownership and a relocation of that dealership, then the data and information obtained as part of the market study will not reflect the new, relocated dealer's expected sales performance, primarily because of the ownership change and relocation, and the resulting customer and market disruption and confusion.

(*Id.* at 8–9). Third, Dilmore concluded that Infiniti's appointment of a new Greenwich dealer deprived Devan of the value of the goodwill purchased from New Country. Dilmore noted that, in his experience, he had "never seen a manufacturer or distributor approve an Asset Purchase Agreement involving the transfer of a dealership's goodwill and then proceed, within a relatively short period of time, to redraw the new dealer's Primary Market Area...." (*Id.* at 9). Finally, Dilmore concluded that Infiniti's appointment of a new Greenwich dealer caused ascertainable loss to Devan. Because of the Greenwich dealer's "proximity advantage," Dilmore concluded that the addition of the Greenwich dealer would diminish Devan's new vehicle sales, used car sales, and service and parts business. Joseph F. Roesner ("Roesner"), another expert for Devan, calculated the cumulative lost net profit as a result of Infiniti's placement of a new dealer in Greenwich to be $3,739,327 in 2007 dollars. (Pl.'s Ex. 40 at 13).

### D. Devan's Proposed Relocation to Wilton

In early 2004, Devan filed the instant action against Infiniti. On or about May 28, 2004, Devan proposed to relocate its dealership facility to Stamford, Connecticut. On June 8, 2004, Infiniti denied that request. On October 12, 2005, Devan submitted another request to Infiniti to relocate its dealership, this time from its location in Fairfield to 190 Danbury Road in Wilton, Connecticut. In a letter to Burack dated October 12, Brostoff stated that the Wilton location would have the following advantages:

First, Wilton and its surrounding towns have some of the best demographics in the country important for a high line franchise like Infiniti. According to Claritas (2003 data), within 7 miles of the site there are 161,671 people with an average age of 38 and an average household income of $150,810. Second, Wilton is surrounded 360 degrees by these wealthy towns-convenient for customers located in any direction. Third, while Wilton is an excellent location to service our current southeastern Fairfield County market, the location will enable us to better service customers in Northern Fairfield County and Northern Westchester where Infiniti lacks representation.

(Def.'s Ex. H (Doc. No. 191)). Brostoff also noted that Bob Sharp Nissan, another dealership located in Wilton, sold more vehicles in 2004 than any other dealer in Fairfield County, and according to its website, was the largest volume Nissan dealer in the state. After receiving Brostoff's request, Infiniti asked Burack to visit the proposed site in Wilton.

On or about October 19, 2005, Burack visited the Wilton site with Brostoff. Initially, Burack thought the proposal was "interesting." (Pl.'s Ex. F. (Doc. No. 198) at 42). Burack noted the following positive features of the Wilton site: it was a single facility; it would provide numerous service bays; it was located within Devan's existing primary area; and the location was zoned for automotive use. He also noted the following negative features: it was located outside the I–95 corridor, it was near the Danbury area, it would require extensive renovation, and it would require further investigation by the national market studies group. Burack did not have final decision-making authority over the relocation request. Burack told Brostoff that Infiniti's regional and national offices would have to evaluate the proposal before the relocation could be approved.

After his visit, Burack reported to Jeff Harris ("Harris"), Infiniti's East Region Vice President, who requested that Infiniti conduct an analysis of the relocation request. Thereafter, Burack made a second visit to the Wilton location with McDowell and Jim DeTrude ("DeTrude"), the assistant regional manager. On October 20, 2005, McDowell noted in an email to others at Infiniti that the proposed site "has some potential." (Pl.'s Ex. S.). McDowell stated that additional information would be required in order to conduct a proper evaluation.

On October 26, 2005, Brostoff sent a letter to Harris, in which he shared his disappointment with Devan's sales performance and described the proposed move to Wilton as a potential solution to that problem.[8] Brostoff stated that Devan sold most of its vehicles to customers located west of Fairfield, close to the Wilton

---

**8.** In letters dated July 17, 2005 and October 14, 2005, Infiniti noted Devan's deficient sales

performance.

site. Brostoff noted that the Wilton site provided a large building surrounded by 18 service bays. In addition, Brostoff stated that Devan would benefit from being in an area surrounded by wealthy towns and located along the heavily-traveled Route 7. In a relocation proposal dated December 13, 2005, Kenneth Hyland ("Hyland"), a business advisor to Devan, reiterated many of the advantages of the proposed Wilton location. Hyland noted that Wilton provided a location that was convenient to Infiniti's customers and a facility that would allow for the growth of Devan's operations. He also noted that sales opportunities were limited at the Fairfield location and that the Wilton location provided better demographics for sales of Infiniti vehicles.

Prior to making a visit to the Wilton location himself, Harris called the market studies department to check on the status of its analysis. People in that department informed Harris that the analysis did not look favorable to relocation, but the analysis was not yet complete. On December 12, Harris sent an email to Brostoff, which stated:

> I got some preliminary information from the Market Studies group in California this morning, and it wasn't positive ... They said the registration analysis, customer convenience mapping, and demographic/household incomes does not support the area as well as the area you are currently in. Lack of competitive luxury makes was also a factor.

(Pl.'s Ex. L). On December 14, 2005, Harris and Burack visited the Wilton location. Harris expressed concern about the proposed location because it was in a wooded area far from the I–95 corridor where most luxury dealers are located.

After the visit, Harris and Burack met with Brostoff to discuss their thoughts. Harris again explained that although the market studies department had not yet completed its analysis, the analysis was not looking favorable to the relocation request. Burack described the meeting in a memorandum dated December 14:

> Mr. Harris explained that he was not impressed with the area as the potential relocation site of the Infiniti dealership versus the current location. Mr. Harris added the building at the proposed site appeared adequate and the increase in facility area for the Parts and Service Dept. would be an improvement over their current facilities. However there were no other dealerships in the Competitive Set in this area and that the impact on shopping patterns and traffic patterns would probably not benefit the potential of success at the proposed relocation site as they would be moving away from the largest section of the luxury market.

(Pl.'s Ex. W at 2). According to Burack, Brostoff was "shocked" at Infiniti's response to the proposal and stated that he could "guarantee" a large sales increase at the Wilton location. (*Id.*). Burack noted that Brostoff believed that relocating to Wilton would provide a solution to Devan's deficient sales performance in Fairfield. Burack also noted:

> Additionally he [Brostoff] added that their Acura dealership (Devan Acura) in Norwalk, CT was in a downtown location and competed very well in an area away from other dealerships. He also went on to add that Bob Sharp Nissan was located further north of the proposed relocation site on Wilton Road (Rte. 7) in an area that was not in an area of automotive dealerships and not [sic] located in an area that he felt was not as good as the proposed relocation site. He noted the large sales performance of Bob Sharp Nissan as [sic] saying he believed they were the largest Nissan

dealership in the State of CT. Mr. Brostoff went on to say that relocation was a topic they had discussed on an ongoing basis since they had become an Infiniti dealer. He explained they moved and relocated to the current location in Fairfield CT because it was the only automotive facility available when they purchased the franchise from the New Country Dealership Organization in Greenwich, CT. Additionally they had presented a potential relocation site in Stamford CT and that Infiniti declined that proposal. He also noted that relocation had been discussed in his conversations with the writer. The writer noted that the topic of relocation had been discussed during contacts. The writer noted that this current proposal was an interesting proposal for review versus other areas in their PMA when they had informed him that they submitted a proposal to the Infiniti East Region for review and National approval after negotiating with the current owner of the property.

(*Id.* at 2–3). According to Burack, Harris informed Brostoff that Infiniti was unlikely to approve the relocation request because of his concerns with the site and the likely outcome of the market study. Burack noted, "Mr. Harris asked Mr. Brostoff and Mr. Blitzer regarding the potential of selling the dealership," but they stated that they did not want to sell it. (*Id.* at 3).

After the meeting with Brostoff, Harris received the final market analysis evaluating the relocation proposal. Infiniti's December 2005 Fairfield market analysis reached the following conclusions:

There is no luxury representation in the vicinity of the proposed location.

Customer convenience, which is currently above primary competitive brands, shows a reduction in the average distance to the Infiniti dealers in the study area, with the relocation to Wilton Motors due to the geographic boundaries of the PMA. The coastline areas of Long Island Sound versus the Wilton Market which is 5 to 6 miles north of the sound, changes the convenience analysis due to the geography density.

The Wilton location would place Infiniti in an area with a higher median household income level, but with a lower population and household density compared to both the current Fairfield Market and Westport Market.

The competitive luxury registration base for the proposed Wilton Market would increase from the current level of 7,971 (Sept 2005 annualized) to 9,776. The proposed Wilton revisions would impact the Greenwich PMA luxury registration base from the current level of 9,195 to 6,823.

(Pl.'s Ex. N. at 47). After reviewing the analysis, Harris called Brostoff to inform him that Infiniti was denying the relocation request to Wilton but would consider any possible relocation to more favorable sites. In a December 21, 2005 contact report, Harris stated:

I called Jonathon Brostoff the morning of December 21 to discuss his proposed relocation to Wilton. I advised Mr. Brostoff that the analysis by National Market Rep and Urban Science confirmed my previous statements to him that Infiniti would not approve the proposed site.

I reiterated my concerns that I voiced during my visit of December 14, which was the fact that there is no competitive luxury representation in the Wilton market, and that the proposed Wilton location would place Infiniti away from luxury competitors and the I–95 corridor. I told Mr. Brostoff that the independent analysis came to the very same conclusion. . . .

The current Infiniti location sits between Lexus and MB, and Infiniti benefits from that luxury shopping pattern. I confirmed that our analysis also indicated that Wilton has a higher household income; however it has a lower population and lower household density than the Fairfield market.

I went on to state that I have to look at Infiniti's representation in the market in a different context than just his dealership. . . . The analysis says that his current location meets customer needs in the context of the entire market better than the proposed location.

Finally, I stated that his proposed location could have other implications as well. At this time, we do not intend on filling the Danbury point any time soon, however, it is a monitored market for Infiniti that we may some day establish representation. Mr. Brostoff's proposed relocation would have long term implications on surrounding markets like Danbury. I emphasized that this was a very small factor in the decision process, and that the primary reason for rejecting his proposal was proximity to other luxury car dealers.

(Def. Ex. K). In a December 21, 2005 letter, Harris confirmed Infiniti's decision. The letter stated that the analysis "concluded that there is no competitive luxury representation in the Wilton market, and the proposed site would place Infiniti away from luxury competitors and the I–95 corridor." (Def.'s Ex. L). The letter stated that Infiniti determined the Fairfield market to be "better suited to compete with competitive luxury makes." (*Id.*). It also stated that the October 2003 market study concluded that Devan should provide Infiniti representation at its current location in Fairfield.

The plaintiff has submitted the expert witness report of Roesner, who concluded that the Wilton location is superior to the Fairfield location for Infiniti sales based on Infiniti's own market study. Roesner notes that the Wilton location is desirable because of its proximity to high income households and buyers of luxury vehicles. Roesner concludes that Infiniti's analysis "indicates that Luxury Car + Truck registrations in the market would increase by 22.6%, Planning Volume would increase by 61.1%, and the number of Units in Operation would increase by 18.3%," and that these three measures "show the potential for greater success for Devan at the relocation site than at its current location." (Pl.'s Ex. O at ¶ 48). He also states that Infiniti's analysis "shows that Infiniti's customer convenience would improve if Devan were to relocate from Fairfield to Wilton" because "for actual and Expected Infiniti buyers as well as for higher income households, a relocation of Devan to the Wilton point would decrease the distance on average that one has to travel to get to an Infiniti dealership." (*Id.* at ¶ 49). He also concludes that "the Proposed Devan Relocation site is comparable to the current Fairfield site in terms of proximity to competitors . . . whether the proximity measure is drive time, drive distance, or air distance." (*Id.* at ¶ 50).[9] Finally, he concludes that Infiniti's analysis "shows that, by selling with equal effectiveness, at distances out to 20 miles, if Devan had been located in Wilton, in each year 2003 to 2006 its sales would have been substantially higher than those actually sold within 20 miles." (*Id.* at ¶ 58). In addition, Dilmore concludes in his expert report that Infini-

---

**9.** However, Roesner concedes that there are no luxury brands, with the possible exception of Buick, within five miles of the Wilton location, and that other luxury dealerships are located much closer to the I–95 corridor.

ti's refusal to allow Devan to move the dealership to Wilton deprived Devan of the opportunity to better serve Infiniti customers and increase market penetration in Fairfield. (Pl.'s Ex. V at ¶¶ 28–29).

Brostoff contends that Infiniti retaliated against Devan for filing this action by not approving the proposal to relocate to Wilton. When asked about the basis for this claim, Brostoff responded:

> The information in the packet, the Urban Science information, the data, and now your market study actually showing that this is going to be a better location for us, I think was overwhelming in light especially of the fact that we were getting these RSE deficiency letters.

> I also know that Steve Burack had liked the location. I know that he had spoken to—I believe that he spoke to Jeff Harris about his feelings, and maybe even Mark Igo.

> I believe that the fact that I was in a lawsuit had come up multiple times in the meeting when they were discussing this relocation.

(Pl.'s Ex. C at 299–300). As a result of being involved in active litigation with Infiniti, Devan also was not considered eligible for an award of excellence.

After Infiniti denied Devan's request to relocate to Wilton, Devan proposed to move from the its current location on Post Road in Fairfield to a location on Commerce Drive in Fairfield. Harris informed Devan that he would likely approve a proposed relocation to this site, which would keep Devan near luxury competitors on the I–95 corridor, and in 2007, the request was approved.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in [its] favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings because the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock,* 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock,* 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. First Count: CUTPA

■ Infiniti has renewed its motion for summary judgment with respect to First Count of the First Amended Complaint, which sets forth a claim that Infiniti violated CUTPA in connection with its approval of an Infiniti dealership in Greenwich after Devan's relocation to Fairfield. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). "Any person who

**308**

suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b" may bring a civil action based on CUTPA. Conn. Gen.Stat. § 42–110g. Connecticut courts have adopted the Federal Trade Commission's "cigarette rule" used to ascertain whether a practice is unfair, looking at the following factors:

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Ventres v. Goodspeed Airport, LLC,* 275 Conn. 105, 155, 881 A.2d 937 (2005) (citation omitted). " '[T]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief.' " *Parker v. Shaker Real Estate, Inc.,* 47 Conn.App. 489, 496, 705 A.2d 210 (1998) (citation omitted). " 'An ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established.' " *Id.* at 496, 705 A.2d 210 (citation omitted). "A plaintiff need not 'prove a specific amount of actual damages in order to make out a prima facie case [under

CUTPA].' " *Service Road Corp. v. Quinn,* 241 Conn. 630, 639, 698 A.2d 258 (1997). "A loss of prospective customers constitutes a 'deprivation, detriment [or] injury' that is 'capable of being discovered, observed, or established.' " *Id.* at 644, 698 A.2d 258.[10]

In the Order Re Motion for Summary Judgment (Doc. No. 121) (the "Order"), the court concluded:

> As to the defendant's contention that the plaintiff has not produced evidence that creates a genuine issue of fact as to the CUTPA claim set forth in the First Count of the First Amended Complaint, the motion is being denied because genuine issues of material fact exist, *inter alia,* as to whether the defendant concealed its intention to place a dealer back in Greenwich after representing to the plaintiff that the former Greenwich point no longer existed because the plaintiff had replaced the former Greenwich Infiniti dealer, and thus engaged in conduct that was immoral, unethical, oppressive or unscrupulous.

(Order at 2–3). Since the court issued the Order, additional depositions have been taken. In renewing its motion for summary judgment on the First Count, Infiniti argues that, now that discovery has been completed, Devan has not produced sufficient evidence to support the factual contentions on which this claim is based.

Infiniti contends that, at the time of the Order, the court was not aware of, or did not have a full understanding of, the following facts obtained in discovery: First, Brostoff testified that McNabb told him that he would not allow another dealership in Greenwich when he spoke to him in November 2002, but no one from Infiniti represented to Brostoff that it could never

---

**10.** The plaintiff has also presented expert testimony in support of a conclusion that the

Devan has suffered an ascertainable loss as a result of Infiniti's actions.

open another dealership in Greenwich in the future. Second, Fisher now concedes that no one from Infiniti ever told him that the Greenwich point could not be re-opened. Third, Infiniti's letter to the DMV stated that Devan was the replacement dealership for New Country but did not state that there would be no Greenwich dealership in the foreseeable future. Fourth, Brostoff and Dilmore concede that, in accordance with the Agreement, Devan had no ownership rights or expectation of ownership in its PMA. Fifth, although Infiniti did not inform Devan of the 2003 study of the New York Demographic Area before it was begun, Infiniti did inform Devan of the study before the Fairfield County portion of the study was begun. Sixth, the analysis for the Fairfield County portion of the market study was completed 18 months after Devan's relocation, and the Greenwich point opened more than 24 months after Devan's relocation.[11] Finally, although one of the purposes of the market study was to assess the viability of the Greenwich market for possible Infiniti representation, witnesses from Infiniti testified that there was no predetermined plan to use the market study to approve a new dealer in Greenwich and that the study of the entire New York demographic was conducted to determine whether any adjustment was needed to its current dealer network.

However, Devan has produced evidence that Infiniti represented that Devan was replacing the Greenwich dealership and the Greenwich point was closed; that Devan was given responsibility for the PMA formerly associated with the Greenwich dealership, except for Greenwich itself, which was assigned to the White Plains

PMA; and that Infiniti's Vice President and General Manager stated that he had refused to allow a plan for another dealership to be placed in Greenwich when Devan relocated to Fairfield. In addition, Devan has produced evidence that could demonstrate that Infiniti knew, in January 2002, that a market study would likely conclude that a monitored or open point in Greenwich would be warranted; that one of the purposes of the market study would be to assess the viability of the Greenwich market for the possibility of Infiniti representation; and that Infiniti was discussing the possibility of re-opening a dealership in Greenwich with Pecunies in August or September 2003, but not with Brostoff, who had stated in his September 4, 2003 letter that Devan would be exploring opportunities to relocate within Fairfield County; and that Infiniti only informed Devan of the results of the market-study after it had already sent a letter of commitment to Pecunies. The evidence produced by Devan is sufficient to create a genuine issue of material fact as to whether Infiniti concealed an intention to place a dealer back in Greenwich and thus engaged in conduct that was immoral, unethical, oppressive, or unscrupulous. *See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 434, 849 A.2d 382 (2004) ("[w]hether a practice is unfair and thus violates CUTPA is an issue of fact."). Because the court has concluded that Devan has created a genuine issue of material fact as to whether Infiniti violated the second prong of the "cigarette rule," it need not address whether Devan has created a genuine issue as to the other two prongs. *See Ventres v. Goodspeed Air-*

11. Infiniti contends that this was an appropriate time frame, even according to Dilmore. However, Dilmore testified that under normal circumstances a new dealer would generally be given a period of 18 to 24 months to demonstrate sales success, but that such a period might be insufficient in the case of a dealership that has recently changed ownership or relocated.

*port, LLC,* 275 Conn. 105, 154, 881 A.2d 937 (Conn.2005) (explaining that "[a]ll three criteria do not need to be satisfied to support a finding of unfairness" and "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three").

Infiniti renews its argument that Devan lacks standing to bring this CUTPA claim. The court addressed this argument in the Order, stating:

> As to the defendant's argument that the plaintiff lacks standing to bring the CUTPA claim set forth in the First Count of the First Amended Complaint, the defendant's motion is being denied because the plaintiff has directed the court's attention to evidence of sufficient actionable conduct apart from that necessary to sustain a protest under the Connecticut Motor Vehicle Act, Conn. Gen.Stat. § 42–133dd, to the reopening of the Greenwich point. Thus, even if the plaintiff had standing to bring an action under Conn. Gen.Stat. § 42–133dd, it has produced evidence supporting additional contentions that would allow it to also pursue a CUTPA claim...

(Order at 1). Infiniti's attempt to re-litigate this issue is premised on its position that Devan has failed to produce evidence of any actionable conduct under CUTPA. However, the court has concluded otherwise. Thus, it finds unpersuasive the defendant's argument that Devan lacks standing to bring a CUTPA claim.

Infiniti also renews its argument that this CUTPA claim is barred by the Statute of Frauds, Conn. Gen.Stat. § 52–550. The court stated in the Order:

> As to the defendant's argument that the CUTPA claim set forth in the First Count of the First Amended Complaint is barred by the Statute of Frauds, Conn. Gen.Stat. § 52–550, the motion is

being denied because proof of an oral contract is not necessary to maintain the plaintiff's CUTPA claim. The applicable analysis was set forth in *Wolf v. Giosa,* No. CV055002481 [2006 WL 3041923], 2006 Conn.Super. LEXIS 3044 (Conn.Super.Ct. Oct. 6, 2006). There, in discussing *Foster Road Associates v. NJM Realty Limited Partnership,* No. CV 94533485 [1996 WL 532502], 1996 Conn.Super. LEXIS 2394 (Conn.Super.Ct. Sept. 13, 1996), the court stated:

> The plaintiff cannot avoid the bar of the Statute of Frauds by labeling the cause of action as one to recover damages for fraud where, as here, proof of a contract, void under the Statute of Frauds, is essential to maintain the action. The court, however, further provided that "[o]ne can envision a set of facts in which a plaintiff might state a valid cause of action for negligent misrepresentation where it took actions in reliance on a seller's representations."

*Id.* [at *4, 1996 Conn.Super. LEXIS 2394] at *5 (citations omitted). A comparable set of facts to that envisioned by the court in *Foster* is presented here.

(Order at 2). In the instant motion, Infiniti argues that discovery has not borne out the factual contentions supporting Devan's claim, and thus there is no comparable set of facts to that envisioned by *Foster* in this case. Infiniti also argues that any alleged representations by Infiniti occurred after Devan entered into an agreement to purchase New Country, and therefore Devan cannot show reliance so as to present a set of facts envisioned by *Foster.*

■ The court's conclusion has not changed. Devan has produced evidence of reliance in representations made by Infiniti prior to the consummation of the purchase transaction. Devan's CUTPA claim is based on those representations. Devan is not seeking to use Infiniti's representa-

tions as evidence of any oral contract between the parties. Thus, the Statute of Frauds does not serve as a bar to a cause of action in situations envisioned by *Foster*, namely those situations in which proof of a contract is not essential to maintaining the cause of action. Therefore, the defendant's motion for summary judgment is being denied with respect to the First Count.

## B. Second Count: Breach of Contract

■ Devan brings a breach of contract claim against Infiniti, alleging that Infiniti violated two provisions of the Agreement. In order to prove a breach of contract under California law, "the plaintiff must demonstrate a contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and damage to the plaintiff." *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 243, 115 Cal.Rptr.2d 900, 38 P.3d 1120 (2002).[12]

First, Devan argues that Infiniti violated § 2.E of the Agreement. Section 2.E reads:

## E. Evaluation of Dealership Facilities and Location

■ Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2. In making such evaluations, Seller will give consideration to: the actual land and building space provided by Dealer for the performance of its responsibilities under this Agreement; the current Guides and Standards established by Seller for the Dealership Facilities; the appearance, condition and layout of the Dealership Facilities; the location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area; and such other factors, if any, as may directly relate to Dealer's performance of its responsibilities under this Section 2. Evaluations prepared pursuant to this Section 2.E will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations, and Seller will consider Dealer's comments. Dealer shall promptly take such action as may be required to correct any deficiencies in

12. "As '[a] federal court sitting in diversity jurisdiction,' the District Court is obligated to 'apply the law of the forum state' in analyzing preliminary choice-of-law questions." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir.2003). The Connecticut Supreme Court has stated: "[I]n accordance with § 187 of the Restatement ... parties to a contract generally are allowed to select the law that will govern their contract, unless either: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Elgar v. Elgar,* 238 Conn. 839, 850, 679 A.2d 937 (1996) (internal quotation marks omitted). Here, the court notes that the parties have selected California law to govern their contract. *See* Pl.'s Ex. 25 at § 14F ("This Agreement shall be deemed to have been entered into in the State of California, and all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties hereof, shall be governed by and resolved in accordance with the internal laws of the State of California, including without limitation the statute of limitations."). The court cannot conclude that the chosen state has no substantial relationship to the parties because Infiniti is a California corporation; nor can the court conclude that application of California law governing breach of contract claims is contrary to the fundamental policy of Connecticut in this case.

Dealer's performance of its responsibilities under this Section 2.

(Pl.'s Ex. 25 at § 2.E). Devan argues that Infiniti failed to use the criteria set forth in § 2.E for evaluating dealership facilities and location when analyzing Devan's request to relocate to Wilton and thereby breached the Agreement. Devan contends that Infiniti would have concluded that the Wilton location was superior to the Fairfield location if it had used these criteria. Specifically, Devan contends that the Wilton location provided for more land and building space; the Wilton location would have met all guides and standards for the appearance, condition, and layout of the facility; the Wilton location would have provided Devan with more favorable sales opportunities; and the Wilton location would have been superior relative to the service requirements of its PMA. Devan also notes that proximity to competing dealerships is not listed as a criterion for evaluating dealership facilities and location.

Reading § 2.E in context, the court concludes that Devan has failed to create a genuine issue of material fact as to whether Infiniti breached its terms because § 2.E applies to periodic evaluations of a dealer's current facilities and location; it does not require Infiniti to evaluate potential relocation requests in accordance with the enumerated criteria. The first line of § 2.E. states that "Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2," and the last line states that "Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 2." This language makes clear that the context in which the enumerated criteria apply is a periodic evaluation of a dealer's performance of its responsibilities at the location at which it is currently operating. "[T]he location of the

Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area" is merely one criterion that the seller must consider in determinating whether a dealer is adequately performing its responsibilities at that location. (*Id.*).

In addition, the Agreement explicitly addresses the issue of relocation. Section 2.C of the Agreement provides that "Dealer shall not move, relocate, or change the usage of the Dealership Location ... without the prior written consent of Seller", and neither § 2.C nor any other provision in the Agreement provides that the criteria enumerated in § 2.E must or should be used in evaluating a relocation request. Therefore, the defendant is entitled to summary judgment on Devan's breach of contract claim based on the enumerated criteria for periodic evaluation of a dealership, set forth in § 2.E of the Agreement.

Second, Devan argues that Infiniti violated the provision of the Agreement which states that "Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the consuming public." (Pl.'s Ex. 25 at 1). Devan contends that Infiniti violated this provision by rejecting Devan's request to relocate to Wilton, ignoring criteria for evaluation of facilities set forth in the Agreement, and discriminating against Devan in favor of other dealers. Devan also contends Infiniti made misrepresentations about the market study performed in connection with the relocation request in violation of the provision of the Agreement which states that "Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Dealer or Infiniti Products and shall engage in no discourte-

ous, deceptive, misleading or unethical practices or activities." (*Id.*).

■ "Although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document." *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 103 (2d Cir.1985) (internal quotations and citations omitted). The description of a contract's purposes is analogous to a "whereas" clause. *See Aramony v. United Way of America,* 254 F.3d 403, 413 (2d Cir.2001). The provisions relied upon by Devan are contained in the section discussing the purposes of the Agreement, under the caption "Introduction". The last sentence in this part of the Agreement states: "To achieve the purposes referred to above, Seller and Dealer agree as follows...." (*Id.*). Then, the specific provisions of the Agreement are set forth.

■ In addition, "it is a fundamental rule of contract construction that specific terms and exact terms are given greater weight than general language." *Aramony,* 254 F.3d at 413. Thus, the court gives greater weight to the specific and unambiguous terms of the Agreement prohibiting Devan from relocating without the express written consent of Infiniti than it gives to the general language discussing the purposes of the Agreement, and Devan fails to show how any alleged conduct on the part of Infinity constituted a breach of contract with respect to § 2.C of the Agreement. Therefore, the defendant's motion for summary judgment is being granted with respect to the Second Count.

## C. Third Count: Breach of Implied Covenant of Good Faith and Fair Dealing

■ Infiniti has moved for summary judgment on Devan's claim for breach of the implied covenant of good faith and fair dealing in connection with Infiniti's denial of Devan's request to relocate to Wilton. "[T]he law implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 817, 169 Cal.Rptr. 691, 620 P.2d 141 (1979).[13] The implied covenant of good faith and fair dealing "may not be read to prohibit a party from doing that which is expressly permitted by an agreement," but it can be breached when a party to an agreement engages in conduct which is "contrary to the contract's purposes and the parties' legitimate expectations." *See Carma Developers (Cal.) Inc. v. Marathon Development California, Inc.,* 2 Cal.4th 342, 373–74, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992).

■ At this stage of the litigation, the court must assess the record in the light most favorable to the plaintiff and draw all reasonable inferences in its favor. Based on the evidence produced by Devan, the court concludes that Devan has created a genuine issue of material fact as to whether Infiniti breached the implied covenant of good faith and fair dealing when it denied Devan's request to relocate to Wilton. Therefore, the defendant's motion for summary judgment is being denied with respect to the Third Count.

13. "Because this cause of action is derivative of an action for breach of contract, the same choice of law analysis applies to the implied covenant claim as applies to the breach of contract claim." *See MM Global Serv. Inc. v. Dow Chemical Co.,* 283 F.Supp.2d 689, 692 (D.Conn.2003) (internal citations omitted).

## D. Fourth Count: CUTPA

■ Devan contends that Infiniti violated CUTPA by denying its request to relocate to Wilton in retaliation for Devan's filing the instant action against Infiniti. At this stage of the litigation, the court must assess the record in the light most favorable to the plaintiff and draw all reasonable inferences in its favor. Doing so, the court concludes that the plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Infiniti violated CUTPA, *inter alia*, by denying Devan's request to relocate to Wilton in retaliation for Devan's filing of the instant action; such a genuine issue is created by evidence, *inter alia*, that Infiniti had an obvious motive for retaliating against Devan, that there were both advantages and drawbacks to Devan's proposed relocation to Wilton, that the Wilton location was superior to the Fairfield location for Infiniti sales based on Infiniti's own market-study, and that a senior representative of Infiniti inquired of Brostoff and Blitzer regarding the potential of selling of their dealership. Therefore, the defendant's motion for summary judgment is being denied with respect to the Fourth Count.

## IV. CONCLUSION

For the reasons set forth above, defendant Infiniti's Motion for Summary Judgment (Doc. No. 184) is hereby GRANTED in part and DENIED in part. The Clerk shall enter judgment in favor of the defendant as to the Second Count of the First Amended Complaint.

It is so ordered.